CRAWLEY, Judge.
C.J.L. (“the mother”) and M.W.B. (“the father”) were divorced in 1999 in Georgia. The divorce judgment awarded the parties joint custody of their three minor children, M.E.B., C.N.B., and D.C.B. The mother moved with the children to Montgomery, Alabama; the father, who is in the United States Army, resides on base at Ft. Ben-ning, Georgia. Once the mother moved to Montgomery, the parties had several problems with the original custody provisions, which awarded the father custodial privileges ■ from Thursday evening through Monday morning. The Georgia- court modified the judgment to change the father’s custodial periods in an effort to better serve the interests of the children and the parties. The parties continued to share custody of the children.
In March 2000, the mother filed in the Montgomery Circuit Court a petition to modify custody. The father contested jurisdiction, and the mother’s petition was ultimately dismissed. In May 2001, the father filed a petition in the Montgomery Circuit Court seeking to have the wife held in contempt for denying him visitation with his children.[1] The mother answered, coun-terpetitioned to hold the' father in contempt, and petitioned for a modification of custody and a suspension of the father’s visitation privileges. The father answered the mother’s petitions and also petitioned for a modification of custody. The trial court appointed a guardian ad litem for the children and appointed Dr. Karl Kirkland, a psychologist, to perform a custody evaluation to aid the court in determining custo-' dy.
After a trial, the court modified custody, awarding the father sole physical custody of the parties’ three children. The mother appeals. She first argues that.the trial court erred by admitting and relying on the testimony of Dr. Kirkland because he, according to the mother, based his recommendation on his diagnosis of parental alienation syndrome (“PAS”), which the mother contends is not widely accepted as a syndrome or diagnosis in the psychological community and therefore does not pass *1172 the “general acceptance” test for the admissibility of scientific evidence under Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923).[2] She also argues that the trial court did not have sufficient evidence from which to find that the children were “alienated” from their father and that the trial court’s modification of custody was contrary to established law. Finally, she argues that the trial court erred by “unduly” relying on a report by the guardian ad litem, which was submitted before trial.

I. A Brief History of Events Surrounding the Original Divorce

To better understand the present case, a brief discussion of certain aspects of the history of the parties’ divorce is necessary. Before the parties separated, in September 1997, the mother told the father that M.E.B., who was four years old at the time, and C.N.B., who was not yet three years old, had indicated that their paternal grandfather, T.D.B., had sexually molested them while their paternal grandmother, J.B., watched. When the mother told the father of these allegations,[3] the father, who was on a temporary assignment at the time, urged the mother to take the children to the base hospital at Ft. Gordon, Georgia, where the father was stationed at the time, to have them examined. The mother had the children examined by Dr. Janus Butcher at Eisenhower Army Medical Center on September 23, 1997, only 3 days after the children first made the allegations. Dr. Butcher found no physical evidence of sexual abuse. The mother, however, was not satisfied with Dr. Butcher’s opinion that no abuse had occurred,[4] and she took the children to see Dr. Sara O’Heron on October 16, 1997, over 25 days after the alleged incidents of abuse occurred. Dr. O’Heron saw the children again on March 31, 1998. Dr. O’Heron opined that sexual abuse had occurred.
Based on Dr. O’Heron’s opinion, the paternal grandparents were arrested and, subsequently, indicted on several charges. For some reason not clear in the current record, the indictments were set aside and the case was resubmitted to another grand jury. The second grand jury “no-billed” the charges. The father strongly supported his parents through the resolution of the allegations against them, further damaging the parties’ already disintegrating marriage and resulting, ultimately, in a bitter divorce.
During the months following the first allegation of sexual abuse and during the divorce process, the children were examined by two psychologists, Dr. Greg Swanson and Dr. Joseph Frey. Both psychologists opined that the children had likely been sexually abused by their grandfather. However, Dr. Frey, who prepared a custody evaluation for the Georgia court, commented that the mother’s behavior, includ *1173 ing “generalizing these charges onto her husband” and “her excessive reliance [on] and indulgence in what her children tell her,” had fueled inappropriate conduct by her during the pendency of the divorce proceedings. He specifically noted her zeal to have the children’s contacts with the father supervised and limited and indicated that the mother wanted the “children away from their father at any cost.” He recommended the shared custody arrangement incorporated into the Georgia court’s divorce judgment, opining that the mother “is incapable of allowing [the children] to form an appropriate relationship and attachment with their father, who has not demonstrated any defined acts of sexual or physical abuse.”

II. The Events Giving Rise to and Underlying the Present Case

The father’s contempt petition in the present case was prompted by the mother’s unilateral decision to deny the father visitation with his children beginning in April 2001. The mother admitted that she denied the father visitation first with D.C.B., a son, who was three at the time, and then with all three children. She explained that the son had returned from the spring break visitation with his father unusually “clingy” and that the son had indicated that he was upset with his father and even stated that he wanted his father dead. The mother said that such behavior was unusual because the son had always enjoyed visitation with the father. Upon her questioning of him, the son commented that the father had spanked him, so the mother inferred that the child had been punished and that he was simply upset at being punished. However, the mother noticed later that evening as she bathed the son that the son’s anal area was red and that the son complained that it hurt. When questioned about why his bottom hurt, the son, according to the mother’s testimony at trial, said that the father had “dug in his bottom.”
The mother testified that she took the son to the emergency room to be examined, but that the emergency-room physician referred her to Dr. Penny White, a pediatrician trained in examining children alleged to be victims of sexual abuse. The mother took the son to Dr. White, who testified at trial that the mother reported that the son had told her that the father “took a white thing and put it in [his] bottom and it goes all the way to God.” Dr. White testified that the results of her examination of the son were “normal” and explained that, typically, physical examinations do not yield abnormal results even if a child has been sexually abused.
In addition to having the son examined by Dr. White, the mother reported the allegation to the Department of Human Resources (“DHR”), which, in turn, contacted the criminal investigation command of the United States Army. At trial, Special Agent Charles Thomas Ames, Jr., testified regarding the Army’s investigation of the allegations against the father. Ames explained that he began working on the case approximately two months after the initial report was filed. He said that a lack of credible evidence had resulted in the Army’s closing the investigation.
When asked to explain what about the investigation led the Army to determine the allegation was unfounded, Ames recalled that when a DHR representative spoke with his predecessor about the allegations, the DHR representative expressed doubts about whether abuse had actually occurred. He also specifically mentioned the mother’s refusal to come to Ft. Benning to give a sworn statement. Ames admitted that the mother had later agreed to give a sworn statement, provided Ames or another agent came to her attorney’s office in Montgomery to take *1174 the statement. Ames also noted that the results of Dr. White’s examination of the child had been normal and that Dr. Terri Brewer,[5] who had not supplied the Army any details of her interviews of the children, stated only that had her interviews revealed that criminal activity had occurred she would have had to notify law enforcement and that she had not done so in this case.
The mother was adamant in her belief that the son had been abused by the father, so she continued to deny him all contact with his children until the trial court, on the motion of the guardian ad litem, ordered that visitation with the father be resumed in September 2001. Although the children were at first reluctant to visit with the father, indicating that they feared him, the visitation apparently went smoothly. However, when the children first resumed visiting the father, the mother wrote her cellular telephone number and “911” in M.E.B.’s shoe and told her children to stay close to each other so their father could not hurt them. The custody evaluator, Dr. Kirkland, communicated with the father by telephone during the first weekend visitation, which took place over the Labor Day weekend 2001. The father, the children, and the father’s stepson met with Dr. Kirkland in his office on September 30, 2001, upon their return from the second visitation weekend. According to Dr. Kirkland, the father and the children informed him that the visits had been pleasant.
However, on September 20, 2001, between the father’s visits with the children, the mother had again taken the son to see Dr. White as a result of the son’s report to his preschool teacher that the father “dug in his bottom with a wiggly knife,” which, according to the record, describes an electric knife. Again, Dr. White’s physical examination was “normal,” with no indications of trauma to the anus. Dr. White said that the child appeared hesitant to report to her what he had already told his teacher, but he did tell Dr. White that he had told his teacher about what his father had done and stated that his father “was ‘bout to cut off [his] head.”

III. The Custody Evaluation■/

The court appointed Dr. Kirkland to perform a custody evaluation in this case. To aid him in this task, D^.' Kirkland" administered psychological tests to the mother, the father, and the father’s wife, L.B., as a part of his custody evaluation. He also interviewed the mother, the father, L.B., and the children. Dr. Kirkland also used projective drawings and therapeutic play with the children.
According to Dr. Kirkland, the psychological testing of the mother yielded an invalid profile on the Minnesota Multipha-sic Personality Inventory 2 (“MMPI-2”) because the mother was consciously attempting to present herself in a positive light. Dr. Kirkland stated that the mother “responded in a naive and defensive manner” and that her profile “is characterized by emotional immaturity, self-centeredness, and a tendency to overreact with emotion to difficulties without fully investigating details.” He noted that “she has a hard time seeing how she has contributed to any of the negative outcomes that have been involved [in this case].” Although Dr. Kirkland determined, based upon the results of the parental stress inventory (“PSI”), that the mother was a competent parent with “a well-informed and thorough parenting style,” he noted what he de *1175 scribed as a “glaring exception” to her competency — “her inability to see around and beyond the current and past accusations of child abuse [in this case].”
Dr. Kirkland opined that the mother’s “continued fueling of the fire surrounding this issue is significant enough to warrant serious questioning of her overall parental capacity.” He further stated that, even throughout the custody evaluation, when she was under extreme scrutiny, the mother continued to act in a way that was not in the best interest of her children by continuing in what Dr. Kirkland concluded was an all-out campaign to undermine, if not totally destroy, the children’s relationship with the father. His written evaluation reveals that the mother believes the father “is at worst dangerous and at best neglectful” and that “[s]he indicated that termination of his parental rights would be the only way in which she would feel completely comfortable.”
The father’s MMPI-2, by comparison, yielded a valid profile. Although the MMPI-2 and his interview revealed that the father “may be overly rigid in his communication style” and that “[h]e may be seen by others as being somewhat cynical and perfectionistic,” Dr. Kirkland concluded that the father was better able to provide structure and discipline for the children. Dr. Kirkland also noted that the father, although aware of and quite disturbed at the mother’s efforts to destroy his relationship with the children, expressed no desire to remove the mother completely from the children’s lives. In fact, Dr. Kirkland opined that the father would be able to promote the mother’s role in the children’s lives if he were awarded custody.
Dr. Kirkland testified about his conclusion that the mother’s behavior in this case had alienated the children from their father. He recalled that the children, when he first interviewed them on August 1, 2001, indicated that they did not wish to visit with their father, and, in fact, reported that they feared their father. After visitation resumed, however, Dr. Kirkland noted that the children reported to him that they had enjoyed the weekend visitations and that they appeared comfortable and affectionate around the father on the afternoon they returned from the second weekend visitation.
Dr. Kirkland testified that he was most concerned that the children’s drawings upon return from visiting with the father were inconsistent with their attitude concerning and their self-reports of visitation with their father. He explained that, when requested to draw a picture of his family, the son drew a picture of several faces; when Dr. Kirkland asked for an explanation of the drawing, the son reported that “Daddy is an ugly man.” M.E.B., when asked to draw a picture of her family doing something together, drew a group of children, representing her, her siblings, and her stepbrother, on a trampoline fighting.
Other drawings by the children appeared, according to Dr. Kirkland, to demonstrate that the children were experiencing some alienation from their father. Dr. Kirkland specifically referenced a drawing by M.E.B., who was eight years old, showing the father pushing the mother into the wall while she was pregnant with D.C.B. According to Dr. Kirkland, it would be highly unusual for a child encouraged simply to draw a picture of her family doing something to draw such a picture. He also noted that M.E.B. would have been only four years old at the time[6] of such an event.
*1176 Dr. Kirkland’s written evaluation also revealed statements by the children before visitation resumed that indicated that they were angry with or fearful of their father. M.E.B. stated that “there was no safe way to visit her father” and said that he had caused her to have attention deficit disorder by throwing her on the bed and kicking her when she was a baby. She also said she wanted to change her last name so that she would not have her father’s last name. Both daughters said “if we don’t see him, we won’t have to get hurt.” The son said, “I don’t like my dad, he’s mean to me.”
In his written evaluation, Dr. Kirkland recommended that the father be granted sole physical custody and that the mother be awarded supervised visitation. Dr. Kirkland stated the following in support of his recommendation:
“[The mother] has consciously or unconsciously chosen the path of alienating the children’s affection from their father. Regardless of whether we label it a particular syndrome, the alienating and destructive behaviors are obvious, persistent, chronic, and pervasive. This is certainly one of the worst, if not the worst, examples of that type of parental behavior that this examiner has ever encountered. Even when there is a custody issue pending, this mother has persisted in destructive behavior with regard to the children’s relationship with their father. The extremity of her position has caused this examiner to be of the opinion that this situation cannot be turned around without a reversal of custody. ... In my opinion, the degree of alienating behavior on the part of the mother in this case is significant enough to warrant the recommendation of a change in custody.”
(Emphasis added.)
Dr. Kirkland was questioned at trial at length about his understanding of, and reliance on, what is known as parental alienation syndrome (“PAS”). He agreed that the term PAS was coined by Dr. Richard Gardner. However, Dr. Kirkland explained that the concept of parental alienation has been researched by other professionals, including Joan Kelley and Judith Wallerstein, for over 20 years. Dr. Kirkland said that he considered PAS, or, more correctly, the behaviors that form what has been labeled PAS, to be a form of parenting style that has been considered to have long-term ill effects on the children of divorce.
Dr. Kirkland testified that he had found evidence indicating that the children were “alienated or at least partially so” because their drawings indicated distress that they did not outwardly demonstrate when they were in the presence of their father. He also explained that, to determine if alienation is indeed occurring, he would consider the parents’ self-reports and the children’s self-reports, and compare the children’s projective drawings to the reports of their behavior during visits. He said that he was particularly concerned in this case, as he was in most post-divorce custody evaluations, with each parent’s ability to present the other parent in a positive, or at least neutral, fight. He said that, although he explained that concept to the mother, she appeared unable to control her desire to damage the children’s relationship with their father. When questioned about whether a less drastic alternative than a change of custody would be appropriate in this case, such as a therapy plan with the family, Dr. *1177 Kirkland stated that he had considered such an approach and had even come close to recommending such a course until the second allegation of sexual abuse of the son was made in September 2001.

TV. Testimony Critical of PAS

The mother presented the testimony of Dr. Greg Swanson, a psychologist, to refute the general acceptance of PAS in the scientific community. He said that PAS was not included as a diagnosis in the Diagnostic and Statistical Manual IV (“DSM-IV”), that the syndrome, developed by Dr. Richard Gardner, had not been thoroughly researched, and that Gardner’s own studies on PAS had not been published in peer-review journals. He did, however, acknowledge that patterns of behaviors that might be referred to as PAS, like bitter fighting between divorced parents and accusations concerning the other parent, occur in post-divorce settings. He also admitted that Dr. Kirkland had not used the term PAS in his custody evaluation and had instead focused on the alienating behavior of the mother.
Dr. Swanson also testified that he did not think a change of custody was a “cure” for PAS or that such a change was necessary in this case. In his opinion, Dr. Kirkland’s custody evaluation was “a bit hasty and ... could easily be biased.” However, Dr. Swanson admitted that he had not been appointed as a custody evaluator and that he was not testifying as to which parent should be awarded custody.

V. The Mother’s Arguments on Appeal

A. The Admission of Testimony Relating to PAS

The mother’s first argument on appeal is that the trial court erred by admitting and relying on Dr. Kirkland’s custody evaluation and testimony. She argues that PAS, which she says Dr. Kirkland used in making his evaluation, does not meet the Frye test for admissibility because it is not generally accepted in the scientific community. See, generally, Hill v. State, 507 So.2d 554, 555 (Ala.Crim.App.1986) (“expert testimony concerning a scientific or medical principle will be admissible only when the proponent of the evidence establishes that the principle has achieved general acceptance in the scientific field to which it belongs”); see also Hoosier v. State, 612 So.2d 1352, 1353 (Ala.Crim.App.1992). Therefore, she concludes, the trial court should be reversed because it relied on Dr. Kirkland’s custody recommendation, which was based, she says, on a diagnosis of PAS.
However, a close reading of Dr. Kirkland’s report reveals that he does not make a diagnosis of PAS. Dr. Kirkland describes what he calls the mother’s alienating behavior and describes the children as becoming alienated or being partially alienated from their father. However, although he lists several articles concerning PAS in his evaluation as sources he consulted, he does not specifically mention PAS in his custody evaluation or recommendation.
The trial court’s judgment does contain a reference to PAS. The court states that the mother had demonstrated “a determined effort to destroy any relationship with [the father] and the paternal family.” The judgment further reads “[t]his attitude is known as ‘parental alienation syndrome,’ a condition as to which the experts differ.” The first of these statements indicates that the trial court determined that the mother had chosen to alienate the children from their father. The second statement seems to indicate that the trial court believed that this pattern of behavior was known as PAS.
Because, as will be discussed further in Part V.B. of this opinion, the evidence supports the trial court’s determination *1178 that the mother had attempted to alienate the children from their father and, more specifically, that the mother had repeatedly demonstrated that she was unable to promote the father’s role in the children’s lives, we do not believe that the trial court’s reference in its judgment to PAS necessitates a reversal. We instead conclude that Dr. Kirkland’s written custody evaluation and his testimony at trial were not based on a diagnosis of PAS as much as they were based on the mother’s repeated and admitted inability to promote, or to at least be neutral concerning, the father’s role- as parent. This behavior, which pervaded both the Georgia proceedings and the current modification proceedings, has bred in the children, according to Dr. Kirkland, a potential for alienation. He decidedly states that the mother’s continued campaign against the father is not in the children’s best interests.
Dr. Swanson admitted that the concept of alienation in post-divorce cases was not new to psychological literature. He explained that he thought that, in some divorce situations, parents become bitterly angry with each other, are unable to relate to each other amicably, and are unable to make the children feel like they are supportive of each other as parents. He summed up his thoughts on PAS by stating that he thought that the above described behavior “might be referred to as parental alienation syndrome, things like that happen after you divorce.”
Although we might, if faced squarely with the question whether evidence concerning an actual diagnosis of PAS was admissible under Frye’s “general acceptance” test, be inclined to agree with the mother and find that PAS had not been generally accepted in the scientific community, we do not need to make that decision in this case. The trial court was presented with a myriad of evidence that the mother desired to end all contact between her children and their father — even to the point of expressing a desire for termination of his parental rights. This court has commented that
“[i]n some instances the custodial parent, in defiance of court-granted visitation rights, uses his or her position to alienate the other parent from the affections of the child, or to create fear of the non-custodial parent in a child, or by his or her words or actions actually encourages a child not to visit with the other parent.”
Hagler v. Hagler, 460 So.2d 187, 189 (Ala.Civ.App.1984).
Dr. Kirkland’s evaluation and testimony indicate that the mother is participating in the above-described conduct. He says she is on a campaign to undermine the children’s relationship with their father, that she is unsupportive of his role as a parent, and that she is attempting to alienate the children from their father. That course of conduct and the mother’s attitude, according to Dr. Kirkland, is damaging to the children, and, he concludes, it is not in their best interest to be raised by a mother who is so bitterly opposed to the children’s father. Dr. Swanson admitted that the concept of such alienating behaviors by bitter divorced parents was not new or novel to psychiatry. In fact, he admitted that such behavior occurred.
The evidence that the mother was behaving in such a way as to damage the children’s relationship with their father, while perhaps at times a basis for a diagnosis of PAS, is not, in this case, subject to Frye’s “general acceptance” standard. We see Frye as serving to prevent the admission of testimony that, by its very nature, removes the necessity for finding individual facts to support a conclusion. As a point of comparison in domestic law, the “tender-years” presumption was similar in *1179 that it, in nearly all circumstances, made the custody determination regarding a child of tender years automatic. After the presumption was abolished in Ex parte Devine, 398 So.2d 686 (Ala.1981), some of the factors that made up the tender-years presumption — age and gender — were still factors for the trial court to consider, but these particular factors no longer mandated a particular custody determination and instead required a trial court to make each custody determination in an individualized manner. Likewise, in this case, the evidence concerning the mother’s behavior, its impact on the children, and the parties’ respective parenting abilities and shortcomings make the underlying decision by the trial court appear not to have been automatic as a result of some mention of PAS, but instead to have been the culmination of a careful consideration of the many factors at work in this case.

B. The Sufficiency of the Evidence

The mother also argues that the trial court did not have sufficient evidence from which to determine that the children were alienated from their father or to modify custody under existing law. She first contends that the children are not suffering from alienation because the father, Dr. Kirkland, and the guardian ad litem all report that the children are comfortable and affectionate with the father. Thus, she concludes, the children have not suffered alienation from the father and the trial court erred by using that rationale as a basis for modifying custody. The only remaining basis, she says, that the trial court has for modifying custody is her denial of visitation, which, under existing law, has been held insufficient as a basis for modifying custody. See, generally, Vick v. Vick, 688 So.2d 852, 856 (Ala.Civ.App.1997). Accordingly, the mother urges us to reverse the trial court’s judgment.
The parties had joint custody of their children pursuant to the Georgia judgment. Therefore, this case is not subject to the standard set out in Ex parte McLendon, 455 So.2d 863 (Ala.1984). Instead, the father was required to prove' that “a change in circumstances has occurred such that it was in the child[ren]’s best interests that the [judgment] be modified to transfer [sole] physical custody.” Means v. Means, 512 So.2d 1386, 1388 (Ala.Civ.App.1987).
The trial court’s judgment notes that, in one respect, a change of circumstances has not occurred because the mother has continued her previous course of conduct. However, the trial court noted that, in its opinion, the mother’s assurances to the Georgia court that she would no longer practice such damaging behavior prevented her from asserting that her resumption of her pre-divorce conduct was not a change in circumstances. We tend to agree in this particular case.
The father presented sufficient evidence from which the trial court could have determined that the children were suffering the effects of alienation, or, in the words of Dr. Kirkland, “at least partially so,” because of Dr. Kirkland’s testimony that the children’s projective drawings and early statements concerning their father were markedly inconsistent with their attitude during or immediately upon the return from a visit with the father. In addition, the other factor that appears to have weighed heavily on the trial court was the fact that the guardian ad litem and Dr. Kirkland indicated that the father, unlike the mother, was able to promote the mother’s role as a parent despite her continued efforts to undermine his role as a parent. The trial court admitted that it had considered maintaining the existing custody arrangement provided the mother encouraged a good relationship between the fa *1180 ther and the children, as she indicated she would because, she said at trial, she realized that her past behavior was inappropriate. However, the trial court clearly-stated that it had decided against that course because it doubted the mother’s sincerity.
The mother argues that the trial court’s modification of custody is actually founded on punishing her for what is essentially a visitation dispute. Our decisions have consistently indicated that a change of custody is not an appropriate sanction for visitation problems. Kelley v. Akers, 793 So.2d 821, 826-27 (Ala.Civ.App.2001); Vick v. Vick, 688 So.2d 852, 856 (Ala.Civ.App.1997); Means v. Means, 512 So.2d 1386, 1389 (Ala.Civ.App.1987); Pons v. Phillips, 406 So.2d 932, 935 (Ala.Civ.App.1981). Howr ever, although the impetus for the father’s original petition was the mother’s outright denial of all contact with the children, we do not believe that this case concerns only a visitation dispute. The mother’s actions in making what have been determined to be unfounded accusations against the father, her then denying the father any contact with the children, and her campaign to undermine the father’s parental role, has, according to Dr. Kirkland, endangered the children’s well-being and, in his opinion, “is tantamount to abuse.”
The record supports the trial court’s adoption of Dr. Kirkland’s criticisms of the mother, who wrote her cellular telephone number and “911” in M.E.B.’s shoe and told her children to stay close to each other so their father could not hurt them when they resumed visitation with the father despite the lack of credible evidence that he had sexually abused any one of the children. In her zeal to protect her children, the mother has become blind to the reality that the evidence does not support the allegations she has made against the father.[7] She testified that the father was a good father, yet she persists in the firm conviction that he may have sexually abused his own son. All of the mother’s behaviors were present in Georgia, where the trial court cautioned in its final judgment that interference with visitation could result in harsh sanctions against the offending parent. The Georgia court even went so far as to state in its custody judgment that it “had serious concerns about [the mother’s] ever allowing [the father] to have a meaningful relationship with the children.” Dr. Kirkland stated in his recommendation that “[c]learly, two extended court battles in two different states should be enough to convince the court that [the mother] is incapable of providing and/or promoting that level of parental support and related parenting that would lead toward healthier relationships with all concerned parties.” The trial court was so convinced, and, given the evidence presented, we cannot say that its decision to modify custody is plainly and palpably wrong.

C. The Trial Court’s Acceptance of and Reliance upon the Guardian ad Litem’s Report

The mother also argues that the trial court erred by admitting and relying upon the guardian ad litem’s report. At trial, the mother’s counsel made the following statements in regard to the guardian ad litem’s recommendation, which is contained in the record:
*1181 “We need to get on the record in regards — Judge, we respectfully take issue with some of the findings of the guardian ad litem. I know it’s probably inappropriate for counsel to cross-examine the guardian ad litem, but I think the Court can take notice that in light of the testimony that’s been elicited and the things that have been shown over the past two days that possibly the findings of the Court-ordered therapist, of Dr. Kirkland, have been disputed by the testimony elicited on behalf of the [mother]. And, as a result, the guardian ad litem — whether—the guardian ad li-tem’s report was, I think, somewhat influenced by the findings of Dr. Kirkland.
“We would certainly take issue with that, and we would note for the Court and the record that we do take issue with the findings of the guardian ad litem.”
The mother cites two law review articles in support of her argument that the use of guardians ad litem in custody cases violates her rights to due process and that the procedure of using guardians ad litem should be abolished because their reports are replete with hearsay, they are not subject to cross-examination, and they act as fact-finder and judge. See Richard Du-cote, Guardians ad Litem in Private Custody Litigation: The Case for Abolition, 3 Loy. J. Pub. Int. L. 106 (Spring 2002); Raven Lidman and Betty Hollingsworth, The Guardian ad Litem in Custody Cases: The Contours of Our Legal System Stretched Beyond Recognition, 6 Geo. Mason L.Rev. 255 (1998).
However, Alabama law clearly permits the use of a guardian ad litem in a custody case. See Ala.Code 1975, § 12-15-1(8). The cases addressing the use of a guardian ad litem make it clear that a trial court may consider, although it is not bound to follow, a recommendation made by a guardian ad litem. Moody v. Nagle, 811 So.2d 546, 548 (Ala.Civ.App.2001).
“Moreover, the authority of a guardian ad litem to make a recommendation as to custody, and the trial court’s ability to consider that recommendation, are inherent in the definition of a guardian ad litem. See § 12-15-1(8), Ala.Code 1975 (a guardian ad litem is ‘[a] licensed lawyer appointed by the court to defend or represent a child in any action to which such child may be a party’).”
G.C. v. G.D., 712 So.2d 1091, 1095 (Ala.Civ.App.1997); see also S.D., Jr. v. R.D., 628 So.2d 817, 818 (Ala.Civ.App.1993) (“The guardian ad litem correctly observes that he is an officer of the court and is entitled to argue his client’s case as any other attorney involved in the case.”). We decline to reconsider the longstanding use of guardians ad litem by the trial courts of this state.

VI. Conclusion

In conclusion, we have determined that the modification of custody in this case was warranted and supported by the evidence. Although we might agree with the mother that testimony concerning a diagnosis of PAS is not admissible under the Frye “general acceptance” test, we do not believe that the Frye test should be applied to Dr. Kirkland’s custody evaluation or testimony in this particular case. Because Dr. Kirkland did not actually diagnose PAS and because his custody evaluation and testimony indicated several underlying reasons for his conclusion that the mother’s behavior was alienating the children from their father and was calculated to undermine and destroy the father’s relationship with the children, we do not believe that the references to PAS in the titles of articles he consulted in compiling his evaluation and in the trial court’s judgment indicate that either Dr. Kirkland or *1182 the court was relying on the syndrome. Instead, it appears that Dr. Kirkland and the trial court considered the behaviors engaged in by the mother, both in Georgia and in Alabama, to be severe enough and to have continued long enough so as to warrant a change in custody. Based on our review of the record, the father proved a change in circumstances and that the best interests of the children would be served by a change of custody. Finally, we decline to reverse the trial court’s judgment because it used the services of a guardian ad litem, which Alabama law permits. Accordingly, we affirm the judgment modifying custody.
AFFIRMED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., dissents.

. The father’s petition uses the term "visitation” although, as we have noted, he was awarded joint custody of his children, making the time he is with his children his custodial period as opposed to simply "visitation.” For consistency, and because of the phrasing of one of the mother's arguments, we will continue to refer to the father's custodial periods as “visitation.”

. Alabama has not abandoned the Frye test, except in cases involving the admission of DNA evidence. See Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 517 n. 5 (Ala.2000) (citing Ala.Code 1975, § 36-18-30).

. The allegations were essentially that the grandfather had "bitten M.E.B. on the bottom” and that M.E.B. had watched her grandfather "bite C.N.B. on the bottom” and that the grandmother, who had watched the above-described events, had told the grandfather not to bite them on the bottom, put Tabasco sauce on his tongue, and put him in "big timeout.”

. Apparently, the children, in the first few days after reporting the incident, were interviewed by someone affiliated with the Georgia Department of Family and Children's Services, the Georgia equivalent of Alabama's Department of Human Resources, who, from what we infer from other items in the record, concluded that it was very likely that the children were sexually molested.

. The record does not disclose what type of medical or mental health professional Dr. Brewer is. Nor does the record indicate exactly when or which of the children were interviewed by her.

. In fact, Dr. Kirkland’s conclusion that M.E.B. would have been four years old when *1176 her mother was pregnant with D.C.B. is incorrect. Because M.E.B. was bom in June 1993, she would have turned four after D.C.B. was bom in February 1997.

. We realize that the Dr. Kirkland, the guardian ad litem, and the trial court indicated that they also believed that the allegations of abuse made against the paternal grandparents were also false. However, we need not pass judgment on that particular fact. It has no bearing on whether the mother’s behavior toward the father since the divorce has either alienated the children from their father or has attempted to undermine the father's relationship to such an extent that a custody modification is warranted.