DONALDSON, Judge.
Robert Broadway (“the father”) appeals from a judgment of the Lauderdale Circuit Court (“the trial court”) denying his petition to modify custody of a child, increasing his child-support obligation, and ordering him to pay a portion of the attorney fees incurred in the litigation by Gloria Broadway (“the mother”).' The mother did not file a brief with this court. We affirm the trial court’s judgment regarding custody and attorney fees; however, the record does not support the portion of the judgment ordering an increase in the father’s child-support obligation. We, therefore, reverse that portion of the judgment.

Facts and Procedural History

The father and the mother have a son, K.B., who was born during their marriage. The father and the mother were divorced in 1999, and the mothér was granted primary physical custody of K.B. At the time of the final hearing in this case, K.B. was over 16 and a half years old, and he was 17 years old by the time the case was concluded in the trial court.
The mother and K.B. live in Florence. The father lives in Huntsville with his wife and their two children, along with two of his wife’s children born of another marriage. The record shows that the parties have been, before the trial court on several occasions following the divorce on the father’s petitions for modification of custody and/or visitation. As early as 2003 and again in 2009, the father filed petitions in the trial court unsuccessfully seeking custody of K.B. based on his claim that the mother had engaged in' parental’alienation.[1] In the ,2010 proceeding (“the .04 *379 proceeding”), the Alpha Center[2] generated a report (“the Alpha Center report”) based on information gathered, from the mother, the father, and K.B. between September 2009 and June 2010, which concluded, among , other things, that the mother had been the cause of K.B.’s alienation from the father. The Alpha Center report recommended that if the father lived in the same geographical area, as K.B., the father should be given physical custody of K.B. in order to reverse the alienation. The Alpha Center report also recommended, however, that KB.’s age and the impact upon him of any disruption caused by relocation should be considered. The Alpha Center report recommended that if physical custody remained with the mother, K.B. should have the opportunity to spend extended time with the father on holidays and school breaks. The Alpha Center report also recommended continued counseling for the mother, the father,'and K.B.
On June 8, 2010, the trial court entered a judgment in the .04 proceeding ordering that the mother continue to have sole physical custody of K.B. The judgment expanded the father’s visitation schedule with K.B. to include every other Tuesday from 4 p.m. to 8 p.m., in'addition to the father’s existing visitation, which included every other weekend, alternating holidays, spring break, and four weeks in the summer, and the judgment increased the father’s child-support obligation to $1,370 per month. The judgment stated that the trial court would monitor the .04-proceed-ing with reviews every six months. -
•The mother began meeting with Lynn McLean, a licensed professional counselor, in April 2008. The father and K.B. began counseling sessions with McLean in April 2009. The last counseling session K.B. had with McLean was in August 2011, and the last session McLean had with the mother was later in August 2011. The father continued to meet with McLean and regularly attended counseling sessions.
On September 16, 2011, the trial court entered an order in the .04 proceeding directing the parties to continue counseling with McLean and to follow her “recommendations, advice, and protocol.” The order discontinued any future reviews. Notwithstanding the September 16, 2011, order, the mother and K.B. did not attend any more counseling sessions with McLean.
On November 29, 2011, the father filed another petition with the trial court, which initiated the underlying proceeding, seeking to modify custody of K.B. The mother answered, denying that custody should be modified, and she counterclaimed for a modification of the father’s child-support obligation and for payment of her attorney fees. The trial court appointed a guardian ad litem to represent K.B.
Trial was conducted on six days between February' 2012 and February 2013. According to the father’s testimony, K.B. had expressed hatred toward him and his current wife since the spring of 2003. The father believed that the hatred was caused *380 by acts or conduct of the mother. As an example, the father described an occasion when his wife had taken K.B, back to the mother following visitation. After being picked up by the mother, K.B. had inadvertently called the father with his cell phone, and the father testified that he heard the mother “badgering [K.B.] about what all happened at my house. What awful things could happen. How bad [the father’s wife] was to [K.B.] while [K.B.] was at' [the father’s] house.” The father alleged that the mother would text K.B. excessively while he was with the father on visitation. The father also contended that the mother tried to limit his contact with K.B. He testified to difficulties in working ■with the mother to reschedule visitation for certain weekends or summer-vacation periods. In the father’s view, the mother was not flexible or cooperative and was often unreasonable in demanding that K.B. be returned from visitation at specific times. The father described how the visitation problems upset K.B., causing him to become withdrawn. The father was concerned about KB.’s academic achievement and his preparations for the ACT examination, which is used to assess an individual’s preparedness for college, while in the primary custody of the mother. The father was also concerned that the mother had allowed K.B. to work at a haunted-house type attraction that depicted violent scenes.
The father also testified to examples of KB.’s behavior that the father attributed to alienation from the father caused by the mother. Those examples included, in the father’s view, K.B.’s not smiling as he would normally smile in' pictures when the pictures were with the father and the father’s family; KB.’s appearing not to enjoy trips on the father’s private plane and his apparent embarrassment for having access to the plane; and KB.’s canceling trips with the father for reasons including not wanting to miss school days or swim-meet activities, despite KB.’s initial enthusiasm for the trips. The father described how K.B. was initially enthusiastic about attending the 2011 BCS National Championship Game as an avid fan of one of the participating college-football teams, but, the father said, after returning to the mother’s home, KB. declined the trip and stated he did not want to miss a day of school.
The mother denied allegations that she had engaged in acts to alienate KB. from the father. She denied the father’s claim that she had told KB. about plans to travel on a cruise during the father’s visitation period before the father had approved. She testified that KB. found out about the cruise through his friends who were also going on the cruise. She admitted that she sent text messages to KB. while he was at the father’s house, but she denied sending an excessive number of texts. She testified that she told KB. to be respectful while visiting at the father’s house, but that she did not prohibit KB. from smiling while at the father’s house or forbid him from showing affection toward the father’s wife. She testified that, although she had allowed KB. to volunteer at a haunted-house type attraction, she was present at the attraction at the times KB. volunteered except for one occasion.
A youth minister from the church KB. attended testified that K.B. was outgoing, easygoing, well-rounded, and enjoyable to be around. He testified that K.B. appeared to be self-confident without any anti-social or violent behavior, that KB. had no difficulty interacting with females, and that KB. paid proper respect to male authority figures. The youth minister stated that KB. usually seemed to be in a good mood and eager to volunteer setting up for church events. The youth minister testified that he worked with students who *381 had serious issues or problems, and that he never had a concern with K.B. He stated that K.B. and the mother appeared to have a healthy, natural teenager-parent relationship and appeared to be respectful to each other. The youth minister testified that it appeared the mother gave K.B. “his space.”
The principal at KB.’s high school testified that she knew KB. from a leadership group that was responsible for certain activities at the school. When KB. was in the ninth grade, she nominated K.B. to be student of the month. She stated that KB. was always pleasant, responsible, and dependable. The principal testified that KB. was a good student, made good grades, was respectful of authority, and never had an issue requiring him to go to her office.
A teacher at KB.’s high school who had KB. in his class from 2011-2012 testified that KB. never caused problems in class, was respectful of authority, and always wanted to be helpful. The teacher did not notice anything unusual with KB.’s moods. He .testified that KB. was a well-rounded young man who had no problems with relationships with other students or the staff. The teacher testified that it-is usually difficult for a student to transfer schools, though, the teacher said, having friends and familiarity in the new school could lessen the difficulty. The teacher testified that KB. had indicated that he was troubled by the ongoing legal proceedings between his parents. The teacher expressed his opinion that KB. was mature enough to make decisions for himself.
Rosemary Snodgrass is a licensed professional counselor who works at the Alpha Center and who participated in the custody evaluation described in the Alpha Center report. Snodgrass testified that the Alpha Center report noted continued hostility between the parents that still existed 10 years after the divorce, poor conflict resolution by the parents, and parental alienation by the mother with indications of a serious problem. Snodgrass defined parental alienation as “when one parent engages in behavior that hinders the child’s relationship with the other parent.” According to Snodgrass, parental alienation rises to a significant level when a child elevates and deifies one parent, who the child sees as capable of doing no wrong, and vilifies the other parent, who the child views as doing everything wrong. She testified that she believed parental alienation could be tantamount to abuse. Snodgrass stated that .she has not had any contact with the parties or KB. since June 2010. She testified that it was possible K.B. would benefit from a change of custody to address parental alienation in the absence of cooperative parenting and if counseling had been discontinued. She agreed that it would be disruptive for K.B. to leave where be has lived all his life and that it is “beneficial for a child to remain with [the] familiar school, with friends, with activities that they have been involved in.”
Monty Weinstein testified that he is a licensed family therapist and psychologist who has published a number of articles, conducted research on parental alienation, and appeared on national TV to talk about parental alienation as a disorder. He defined parental alienation as the systematic and methodical removing of a noncustodial parent from the life of that parent’s child. He believed parental alienation was a form of emotional child abuse. In his opinion, there was very severe parental alienation on the part - of the mother, and, in his opinion, the only way to reverse the result was to change custody of KB. to the father, with limited visitation given to the mother, coupled with therapy for KB.. Dr. Weinstein did not believe a change of cus *382 tody would cause a disruption in KJB.’s life, and he predicted numerous adverse consequences for K.B. if custody was not changed to the father. Dr. Weinstein based his opinions in part on his meetings with the father and K.B., but he did not meet with or obtain information from the mother.
Karen Wagner is a private consultant who works with at-risk youth. -She has a graduate degree with specialized training in risk and prevention regarding school-aged children. Her experience included evaluating a child’s risk of arrest, assessing home environments, and designing interventions for children. Wagner -described K.B. as being dysfunctional .and stated that, due to extreme parental alienation, custody should immediately be changed from the mother to the father.
Lynn McLean is a licensed professional counselor who testified regarding her counseling sessions with the parties and K.B. McLean testified to the circumstances leading to her conclusion of parental alienation on the part of the mother. She testified to some progress' made by the parties and K.B. with the counseling sessions, but she believed K.B. was “worn put” from going to counseling sessions with her. She-testified that K.B. was at serious risk for future problems if custody was not changed to the father.
K.B. was called to testify by the guardian ad litem. < He was required.to answer questions in camera regarding his views of both the mother and the. father, K.B. expressed a desire for the court proceedings to end. He testified that he preferred to. live in Florence with his mother for various reasons, including school activities and the proximity of his friends. K.B. testified that did not want to transfer to another school in Huntsville if the father obtained custody.- He denied that the mother alienated him from the father, and he testified that the mother did not discourage him from doing things with the father. K.B. testified that he opposed further counseling because it interfered with his social life and that he did not like talking about his feelings to people, -such as counselors, who then revealed those conversations to a court.
The mother submitted the father’s 2010 and 2011 tax returns, the mother’s 2011 tax return, and CS-41 and CS-42 forms as evidence regarding her request to increase the father’s child-support obligation. For the requested attorney fees, an exhibit was submitted that listed itemized tasks, the time expended by the mother’s counsel for each task, and the counsel’s hourly rate.
On June 7, 2013, the trial court entered a judgment denying the father’s petition to modify custody, without making* specific findings of fact, by stating: “The Father’s Petition to Modify Custody is DENIED as the Court finds that the burden of proof required to change custody under the McLendon standard has not been met.” The judgment increased the father’s monthly child-support obligation to $5,000 and ordered the father to pay for the mother’s' attorney fees in the amount of $22,200. The judgment also established a specific visitation schedule for the father.
The mother and the father filed post-judgment motions on July 1, 2013. The father filed a motion for a new trial, arguing that the judgment was against the overwhelming weight of the evidence and that the trial court had erred in modifying child support and awarding attorney fees. On July 30, 2013, the trial court entered an order denying the father’s postjudgment motion, and on August 21, 2013, the trial court denied the mother’s postjudgment motion. On September 5,- 2013, the father timely filed a notice of appeal.
*383 On appeal, the father asserts that the portions of the judgment refusing to grant his request to change physical custody of K.B. and ordering him to pay some of the mother’s attorney fees should be'reversed and that the trial court erroneously increased his child-support obligation.

Discussion

I. Denial of Father’s Custody-Modification Petition

 “When evidence in a child custody case has been presented ore tenus to the trial court, that court’s findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing. See Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), wherein this Court, quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993), set out the well-established rule:
“‘Our standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, Payne v. Payne, 550 So.2d 440 (Ala.Civ.App.1989), and Vail v. Vail, 532 So.2d 639 (Ala.Civ.App.1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court’s discretion is shown. To.substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. Gamble v. Gamble, 562 So.2d 1343 (Ala.Civ.App.1990); Flowers v. Flowers, 479 So.2d 1257 (Ala.Civ.App.1985).’ ”
Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).
At the time the father filed his petition to modify custody of K.B., the mother had primary physical custody pursuant to the divorce judgment. Therefore, the evidentiary standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984), applied to the father’s petition to modify the prior custody determination. See P.A.T. v. K.T.G., 749 So.2d 454, 456 (Ala.Civ.App.1999) (applying the McLendon standard to custody-modification case where the parents shared joint legal custody and one of the parents had primary physical custody of the child). Under the evidentiary standard of McLendon, the father was require4 to demonstrate (l)t that a, material change in circumstances has occurred, (2) that a change in custody would materially, promote K,B.’s welfare, and (3) that the benefits of the change will more than offset the disruption caused by that change. McLendon, 455 So.2d at 865-66. “‘Appellate review of a judgment modifying custody when the evidence was presented ore tenus is limited to determining whether there was sufficient evidence to support the trial court’s judgment.’ ” Nail v. Jeter, 114 So.3d 844, 851 (Ala.Civ.App.2012) (quoting Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala.Civ.App.2007)). The judgment in this case, does not contain findings of fact and states only that the father failed to meet the McLen-don standard for modifying- custody. In the absence of specific findings of fact, we will assume the trial court, made the findings necessary: to support its judgment if those findings are supported by the record. Ex parte Fann, 810 So.2d 631, 636 (Ala.2001) (quoting Lemon v. Golf Terrace Owners Ass’n, 611 So.2d 263, 265 (Ala.1992)).
*384 The father’s arguments for modification of custody all revolve around the issue of alleged parental alienation on the part of the mother. The father first argues that the trial court erred in disregarding expert testimony that K.B. suffered from parental alienation caused by the mother and that a change of custody was necessary. Although the trial court could admit opinion testimony from the father’s witnesses, the trial court remained free as the finder of fact to assign whatever weight to the testimony it found to be appropriate and to assess the credibility of the expert witnesses as it does with any witness:
“An expert’s opinion, even if uncontro-verted, is not conclusive on the trier of fact; instead a trial court must look to the entire evidence and its own observations in deciding factual issues. See Williams v. City of Northport, 557 So.2d 1272 (Ala.Civ.App.1989). The trier of fact determines the weight and credibility to be attributed to an expert’s opinion. See Clark Lumber Co. v. Thornton, 360 So.2d 1019 (Ala.Civ.App.1978).
“The presumption of correctness in a trial court’s ruling where evidence is presented ore tenus is especially applicable where, as here, the evidence is conflicting. Ex parte P.G.B., [600 So.2d 259 (Ala.1992) ]. ‘The reason for the ore tenus rule is well-established, i.e., that the trial court had the opportunity to observe witnesses as they testified, to judge their credibility and demeanor, and to observe what this court cannot perceive from a written record.’ Dobbins v. Dobbins, 602 So.2d 900, 901 (Ala.Civ.App.1992). The perception of an attentive trial judge is especially critical in a child custody case. This court is not permitted to substitute its judgment on appeal for that of the trial court if, from the evidence, there is any reasonable inference that the trial court’s decision is correct. Jones v. Wright, 555 So.2d 1127 (Ala.Civ.App.1989).”
G.T.R. v. U.D.R., 632 So.2d 495, 497 (Ala.Civ.App.1993).
Although the witnesses presented by the father were uniformly of the opinion that K.B. exhibited behaviors consistent with parental alienation, the trial court also heard testimony indicating that KB.’s behavior was consistent with KB.’s desires not to appear ostentatious, to spend time with his friends and his girlfriend, and to not miss school and athletic-team activities, At the time KB. testified, he was a few months away from turning 17. The trial court was in a position to assess KB.’s testimony and to decide whether KB,, was capable of independent thought and decision-making. The trial court could reasonably have weighed the expert witnesses’ conclusions of drastic and profound problems being endured by KB. against testimony from KB.’s teacher, principal, and youth minister directly contradicting those assertions, and it could have reasonably considered the testimony of KB. in determining whether the facts presented by the father met the McLen-don standard for changing physical custody of a child of that age.
The father asserts the facts in this case are similar to the facts in C.J.L. v. M.W.B., 879 So.2d 1169 (Ala.Civ.App.2003), in which this court affirmed a trial court’s custody determination involving a finding of parental alienation. In that case, the court-appointed psychologist found that the mother exhibited one of the worst parental-alienating behaviors he had encountered after conducting interviews and psychological testing of all the parties and the children. We held that the record supported the psychologist’s conclusion that the mother’s extreme actions, which included making unfounded accusations *385 against the father of sexually abusing the children, denying the father any contact with the children, and undermining the father’s parental role, were tantamount to abuse. We agreed that “the mother’s assurances to the Georgia court [that had divorced the parents] that she would no longer practice such damaging behavior prevented her from asserting that her resumption of her pre-divorce conduct was not a change in circumstances.” 879 So.2d at 1179. In C.J.L., the trial court determined that the McLendon standard had been met.
We note that the mother’s alleged acts in this case differ markedly from the acts described in C.J.L. We also note that we are not permitted on appeal to substitute our judgment for that of the trial court; instead, we are to determine whether the trial court’s judgment is supported by the evidence in the record after applying the appropriate standard of review. Ex parte Bryowsky, 676 So.2d at 1324. In C.J.L., the trial court determined that custody should be changed after assessing the credibility of the witnesses and weighing the testimony. We held that the evidence supported that determination; however, that holding was based on the trial court’s assessments of the weight of the evidence and the credibility of the witnesses. In this case, the trial court determined that custody should not be changed after performing the same function. We cannot reweigh the evidence or substitute our judgment for that of the trial court; rather, we are constrained to examine only whether the trial court could have made its determination based on the record.
The father contends that the material changes in circumstances requiring a change in custody are that K.B. is no longer in counseling and that the opinion of experts point to parental alienation as an issue. The record indicates that the father has raised parental alienation as an issue since 2008. The father testified to ongoing problems with the mother over visitation issues, but he testified that he had dealt with difficulties with visitation and K.B. for 12 years since the divorce. The father characterizes the mother’s actions as “continued parental alienation.” The trial court was not required to accept the evidence as establishing a material change of circumstances since the last custody-modification proceeding.
The father’s final argument for custody modification is that the trial court should have imposed measures to preserve his role in KB.’s life. The father, however, does not suggest any measures for that purpose or cite legal authority establishing a duty on the part of the trial court to institute such measures. We note that the evidence shows that K.B. has a relationship with the father, albeit not a close relationship. Although a change in custody would have provided more of an opportunity for K.B. to develop a closer relationship with the father, the judgment in this case still maintained a -visitation schedule for the father. The father has failed to demonstrate any error by the trial court, much less that the trial court erred in determining that he had failed to meet the McLendon standard required for a change in custody.

II. Increased Child^Support Obligation

The father next contends that the trial court erred in increasing his monthly child-support obligation from $1,370 to $5,000.
“An award of child support may be modified only upon proof of a material change of circumstances that is substantial and continuing. Browning v. Browning, 626 So.2d 649 (Ala.Civ.App.1993). The parent seeking the modification bears the burden of proof. Cunningham v. Cunningham, 641 So.2d 807 *386 (Ala.Civ.App.1994). Whether circuixir stances justifying modification of support exist is- a matter, within the. trial court’s discretion. Id. We will not disturb the trial court’s decision on appeal unless there is a showing that the trial court abused that -discretion or that the judgment is plainly and palpably wrong. Id.; Douglass v. Douglass, 669 So.2d 928, 930 (Ala.Civ.App.1995).”
Romano v. Romano, 703 So.2d 374, 375 (Ala.Civ.App.1997). “This court has held that- ‘“[t]he standard for determining changed circumstances is the increased needs of the child and the ability of the parent to respond to those needs.””’ Jones v. Jones, 101 So.3d 798, 803 (Ala.Civ.App.2012) (quoting Allen v. Allen, 966 So.2d 929, 932 (Ala.Civ.App.2007), quoting in turn Coleman v. Coleman, 648 So.2d 605, 606 (Ala.Civ.App.1994)). “There must be evidence before the trial court that a material change in circumstances has occurred before the child support' obligation can be modified.” Layfield v. Roberts, 599 So.2d 1169, 1173 (Ala.Civ.App.1991) (citing Sansom v. Sansom, 409 So.2d 430 (Ala.Civ.App.1981)). A trial court exceeds it's discretion when it increases a party’s child-support obligation without any evidence to support that a material change has occurred. Id.
The evidence shows that when child support was established to be $1,370 in June 8,- 2010, the father’s income exceeded the uppermost level of the Child Support Guidelines set out in Rule 32, Ala. R. Jud. Admin. At the time of the trial in the present case, the father’s income continued to exceed the uppermost level of-the guidelines. We have not been directed, to any evidence of expenses related to supporting K.B, or to; any evidence of any change of circumstances to require an increase in child support. The mother’s 2011 income statement does not indicate any change to the mother’s financial situation, and the father’s income statements actually reflect a decrease in income from 2010 to 2011. Without evidence supporting a material change in circumstances, we hold the trial court exceeded its discretion in increasing the father’s child-support obligation.

III. Award of Attorney Fees

The father contends that the trial court erred in awarding the mother attorney fees. His argument is that the mother presented insufficient evidence to establish the reasonableness of the attorney fees and that the trial court should have considered certain factors in awarding attorney fees.
“ ‘Whether to. award an attorney fee in a domestic .relations case is within the sound discretion of the trial court and, absent an abuse of that discretion, its ruling on,-that question will not be reversed. Thompson v. Thompson, 650 So.2d 928 (Ala.Civ.App.1994). “Factors to be considered by the trial court when awarding such fees include the financial circumstances of the parties, the parties’ conduct, the results of the litigation, and, where appropriate, the trial court’s knowledge and experience as to the value of the services performed by the attorney.” Figures v. Figures, 624 So.2d 188, 191 (Ala.Civ.App.1993). Additionally, a trial court is presumed to have knowledge from which it may set a reasonable.attorney fee even.when there is no evidence as to the reasonableness of the attorney fee. Taylor v. Taylor, 486 So.2d 1294 (Ala.Civ.App.1986).’”
Lackey v. Lackey, 18 So.3d 393, 402 (Ala.Civ.App.2009) (quoting Glover v. Glover, 678 So.2d 174, 176 (Ala.Civ.App.1996)).
The mother requested attorney fees in a case that spanned nearly two years before the trial court- and involved numerous mo? *387 tions, hearings, and six days of testimony. The mother submitted an exhibit detailing the services rendered by her attorney, the time her attorney expended on each undertaking, and the attorney’s hourly rate. A trial court may rely on its knowledge and experience in assessing the value of an attorney’s services even -without evidence regarding the reasonableness of the attorney fees. Lackey v. Lackey, 18 So.3d at 402.
Martin v. Martin, 85 So.3d 414 (Ala.Civ.App.2011), cited by the father, does not provide support for his position. In Martin, this court directed the trial court to further evaluate its award of attorney fees because we reversed the trial court’s property division and remanded that issue for further consideration. In this case, we affirm the trial court’s judgment on- the custody issue that was the primary contention between the parties, and the trial court has no remaining issues to consider after our reversal of th¿ increase in child support.'
The evidence showed that the father’s income was over 170 times greater than the mother’s income, and the judgment noted the disparity of income between the parties in awarding the mother attorney fees. We hold that the trial court did not. exceed its discretion in awarding the mother attorney fees.

Conclusion

For the foregoing reasons, we affirm the trial court’s judgment as to the denial of the father’s request to modify physical custody and the award of attorney fees to the mother. We reverse the judgment as to its increase of the father’s child-support obligation, and we remand the cause for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. In Goetsch v. Goetsch, 990 So.2d 403, 409 (Ala.Civ.App.2008), parental-alienation syndrome was defined as "a syndrome in which one parent engages in a campaign to break off or minimize a child’s contact with the other parent and to shift the child’s percep *379 tion of that other parent in a negative direction.” In C.J.L. v. 879 So.2d 1169, 1177 (Ala.Civ.App.2003), the trial court in that case had defined parental-alienation syndrome as “ ‘a determined effort to destroy any relationship with [the father] and the paternal family,’ ” The definitions of parental alienation from expert testimony in this case range from "when one parent engages in behavior that hinders.the child’s relationship with the other parent” to "the systematic and methodical removing of a noncustodial parent from the life of that parent’s child,” without regard to the intent of the custodial parent.

. The record is unclear as to whether the trial court ordered the Alpha Center’s custody evaluation or if one of the parties hired the Alpha Center.