PER CURIAM.
K.T.D. (“the mother”) appeals from a judgment of the Cleburne Circuit Court (“the trial court”) that modified her custodial rights to K.P. (“the child”). K.W.P. (“the father”) cross-appeals from the same judgment insofar as the trial court failed to modify his child-support obligation.

Procedural History

The child was born in March 2007 when the mother was 16 years old and the father was 21 years old. The record indicates that the trial court entered a judgment on or about December 4, 2007, that adjudicated the father as the father of the child, awarded sole custody of the child to the mother, awarded the father “standard” visitation with the child after a “phase-in” period, and ordered the father to pay $548 a month in child support to the mother. Neither party was ordered to provide health insurance for the child, but the parties were required to equally share the cost of “noncovered” medical expenses for the child. The record indicates that the December 2007 judgment stated that the parties “shall communicate regarding the ... child through the [fatherj’s mother and the [motherj’s mother.” The father’s mother (“the paternal grandmother”) and the mother and her mother (“the maternal grandmother”) were the only individuals authorized to exchange custody of the child, which was to take place at the Heflin Police Department. The trial court also ordered the child’s surname to be changed from the mother’s surname at the time, T., to the father’s surname, P.
On July 26, 2010, the mother filed a petition to modify the December 2007 judgment, and she sought: (1) specific and reasonable telephone visitation with the child while the father was exercising visitation, (2) an order requiring the father to provide her with advance written notice of his intention to travel with the child for distances greater than 60 miles, (3) an order requiring the father to notify her if the child stays anywhere other than the father’s home overnight, (4) an order requiring the father to notify her if the child requires medical treatment during the father’s visitation periods, (5) an order requiring the father to notify her if someone else is caring for the child during his visitation periods, (6) the “right of first refusal” if the father requires child care for more than 3 hours during his visitation periods, (7) removal of the requirement in the December 2007 judgment that the parties communicate through the maternal grandmother and the paternal grandmother, and (8) an order modifying the father’s visitation rights with the child.
The father subsequently filed an answer and a counterclaim to modify the December 2007 judgment. The father sought sole custody of the child or, in the alternative, a modification of his visitation rights so that he had the child “50% of the time.” The father also sought an order requiring him to pay health insurance for the child and a corresponding modification of his child-support obligation. Finally, the father sought to hold the mother in contempt for her failure to change the child’s surname to the father’s surname or to use the father’s surname.
The trial court conducted an ore tenus hearing over two days — January 30, 2012, *421 and February 2, 2012. On February 7, 2012, the trial court entered a judgment modifying the December 2007 judgment by awarding the parties joint legal and joint physical custody of the child. The trial court found that there had been a material change in circumstances that warranted a modification of custody, that the change in custody would materially promote the child’s best interest, and that the benefits of the change in custody would more than offset the disruptive effects caused by the change. Specifically, the trial court found that the parties had been unable to communicate with one another, that the parties cannot co-parent the child without communicating with one another about the child, that the mother had “used very poor judgment in her behavior towards the [father] and his family,” that the mother’s behavior had been detrimental to the child, and that the mother had attempted to interfere with the relationship between the child and the father.
The father was awarded physical custody of the child during weeks containing the first, third, and fifth weekends of each month from Wednesday at 6:00 p.m. until Monday at 9:00 a.m. During the weeks that the father did not have a weekend custodial period, he was awarded custody of the child from Tuesday at 6:00 p.m. until Thursday at 9:00 a.m. The father was awarded four weeks of physical custody in the summer, one week during Christmas, and other specific holiday visitation. The trial court, in its lengthy judgment, set forth numerous provisions in an attempt to facilitate communication between the mother and the father, including an order that the mother, the father, and the child attend family counseling. The trial court held the mother in contempt for willfully failing to use the child’s surname as ordered in the December 2007 judgment. The judgment did not modify the father’s child-support obligation.
On February 20, 2012, the mother filed a timely postjudgment motion pursuant to Rule 59(e), Ala. R. Civ. P., arguing that the father had failed to meet the burden of modifying physical custody of the child pursuant to Ex parte McLendon, 455 So.2d 863 (Ala.1984). On February 21, 2012, the father filed a timely post-judgment motion requesting, among other things, that the trial court order him to be responsible for the child’s health-insurance costs and to modify his child-support obligation in light of the new custodial arrangement and the evidence that he was paying the cost of the child’s health insurance.
On March 5, 2012, the trial court entered an order amending its judgment to provide the father with custody of the child on Father’s Day and to remove the requirement that the maternal grandmother and the paternal grandmother “be involved in arranging physical custody or placement of the child with the parties.” The trial court denied all other postjudgment requests for relief. The mother timely appealed, and the father timely filed a cross-appeal.

Issues

In her appeal, the mother argues that the trial court erred by concluding that the father had met his burden of proving that there had been a material change in circumstances sufficient to warrant a modification of custody pursuant to Ex parte McLendon, supra. In his cross-appeal, the father argues that the trial court erred by failing to modify his child-support obligation.

Facts

At the time of trial, the mother was 21 years old, the father was approximately 25 years old, and the child was 4 years old. The record indicates that the mother and the father did not speak to each other, or *422 even have each other’s telephone numbers, from before the child was born in 2007 until early summer 2010. After the child reached her third birthday in March 2010, the father was able to exercise a full week of visitation with the child for the first time in the summer of 2010, so the mother began contacting the father in order to speak to the child while she was visiting the father. Both parties agreed that the child did not like to talk on the telephone before this point because of her age.
The record indicates that there is a history of animosity between the father and the mother and her family. In 2007, the father was convicted of third-degree assault and harassing communications. The circumstances of those convictions are not clear in the record, but the record indicates that the mother’s father was involved. The record indicates that the father was also convicted of menacing in 2008, in a matter unrelated to the mother or her family, when he “made [a] gun visible” during a traffic dispute with another driver on a busy road. The father admitted that he had spent 40 days in jail for that charge.[1] The father admitted that he had had an anger problem and that he had begun seeing a psychiatrist. He testified that his psychiatrist had prescribed two medications to stabilize his mood and that he sees his psychiatrist approximately every three months.
The lengthy record on appeal reveals an almost complete inability of the mother and the father to effectively communicate with each other about the child. The mother admitted that the father had tried to communicate with her about his visitation with the child by sending messages with the paternal grandmother, by sending the mother a certified letter, and by calling the mother. The mother admitted that she had received the father’s communications and that she had not responded to any of them because, she said, visitation matters did not concern the child. The mother complained that the father took the child on vacation without telling her, that he took the child to the doctor for medical treatment without informing her until after it was completed, and that the father did not answer her telephone calls when he was exercising his visitation rights with the child. The father admitted that he had not called the mother before he took the child to the emergency room for stitches on one occasion but that he had called the mother on his way home from the hospital. The father disputed the mother’s contention that he did not answer her telephone calls during the child’s visitation, and he presented telephone records to support his testimony. The mother admitted that she had never informed the father of any medical issues concerning the child and that she had never informed the father that she was taking the child on vacation. The father did not inform the mother when he got married in October 2009, and the mother did not inform the father when she got married in December 2010.
The father testified that he wanted custody of the child because the mother was doing everything that she could to alienate the child from the father and his family. The father testified that the mother still used her maiden name as the child’s surname instead of using the father’s surname as ordered by the trial court in the December 2007 judgment. The father presented evidence, namely, the child’s medical records and prescription records, indicating that the child’s surname was the same as the mother’s maiden name. The father stated that this had caused a great deal of *423 confusion and stress for the child, who, he said, got visibly tense whenever a stranger asked her what her name was.
In addition, the father testified that the mother was unwilling to communicate with him about the child and that she was inflexible regarding his court-ordered visitation. For example, the father asked if he could switch his visitation weekend and have one extra day of visitation so he could take the child to Tennessee to visit his family for Christmas. After attempting to contact the mother several times without receiving a response, the father eventually received a letter from the mother’s attorney that stated that the mother was willing to allow the father to have custody of the child during the period he requested in return for him giving up his week of Christmas visitation with the child. The father chose not to give up his week of Christmas visitation with the child, so the child was not permitted to go on the trip. According to the father, the child was very upset that she could not go to Tennessee. The mother had also refused to allow the father to have a few “unscheduled” hours with the child so that the child’s paternal great-grandmother, who was coming to town for a funeral, could meet the child for the first time.
The father stated that the mother had told him that, because she had sole custody of the child, the father could not take the child more than 60 miles away from his home, that the father could not take the child to the doctor, and that the father had no rights to the child except to visit the child. He further testified that the mother had, on one occasion, required the father to take a picture of the child’s dinner to prove that she was eating spaghetti and that, on another occasion, the mother had told the child that the dinner of macaroni and cheese that the father had fixed for the child was not sufficient. The father testified that the mother’s comments and actions sent a message to the child that the father could not adequately care for the child.
According to the father, the mother arbitrarily changed his half day of visitation with the child on his birthday, which was initially scheduled from 12:00 p.m. to 6:00 p.m., to 9:00 a.m. to 3:00 p.m., which the father could not exercise because he was at work during those hours. The father also testified that the mother expects to talk to the child every day when the child is with the father but that she does not allow the father to talk to the child when the child is with the mother. The mother testified that the father never called her to talk to the child during her custodial periods, but she admitted that the December 2007 judgment required all communication about the child to go through the paternal grandmother and the maternal grandmother.
The paternal grandmother testified at length about problems she had had with the mother and the maternal grandmother during visitation exchanges. According to the paternal grandmother, the mother did not answer the father’s telephone calls, she did not sign for certified mail sent to her by the father, and she did not acknowledge the receipt of regular mail sent by the father, so the father’s only method of communicating with the mother was through the paternal grandmother at visitation exchanges. The paternal grandmother stated, however, that she thought that communicating at that time was inappropriate because it meant discussing issues in front of the child. According to the paternal grandmother, the mother had refused to accept the birth certificate that the father had obtained that changed the child’s surname to the father’s surname, that the mother had refused to accept written communication from the father at visitation *424 exchanges, and that the mother refused to discuss altering the father’s visitation schedule.
On May 28, 2010, the mother refused to allow the paternal grandmother to take custody of the child because the paternal grandmother had the child’s child-restraint seat on one side of the back seat of her vehicle instead of in the middle of the back seat. The paternal grandmother explained that she had to put the child’s child-restraint seat on the side of her back seat because she had a second child-restraint seat on the other side of the back seat for the father’s infant son and that she had had both child-restraint seats installed by the fire department. When the mother told the paternal grandmother that she could not take the child, the paternal grandmother offered to move the child’s child-restraint seat to the middle of her back seat. According to the paternal grandmother, the mother stated that the paternal grandmother did not move the child-restraint seat fast enough so the mother “snatched” the child, put the child in the back seat of the mother’s vehicle without buckling the child in her seat, and left. The paternal grandmother went inside the police station to file a report, and the mother and the maternal grandmother eventually returned. Officer John Daniel testified that the mother and the maternal grandmother were “throwing a fit” in front of the child about the position of the child-restraint seat and that he had called the Department of Human Resources at the request of maternal grandmother because the parties could not resolve the issue on their own. Jennifer Rios, from the Department of Human Resources, came to the location of the visitation exchange. Rios stated that the mother was yelling and behaving irrationally and that she was concerned for the child because the mother would not calm down. However, she testified that she identified no safety risks to the child and that she left the scene without initiating an investigation or doing any follow-up investigation. Rios and Daniel both testified that the mother had overreacted to the situation. The record indicates that an officer eventually moved the child’s child-restraint seat to the center of the paternal grandmother’s back seat, and the paternal grandmother left with the child approximately two hours after she had arrived to pick up the child.
On August 22, 2010, the mother became upset at a visitation exchange because the paternal grandmother did not return the child’s “sippy cup.” The paternal grandmother explained that the sippy cup had been left on her sister’s boat on a lake approximately 45 minutes away and that, when the boat was returned later that night, she would bring the sippy cup to the mother. The mother demanded that the paternal grandmother immediately drive back to the lake to retrieve the sippy cup, and when the paternal grandmother told the mother that she would return the sip-py cup later that evening, the mother stated that she was going to file a police report and say that the sippy cup had been stolen. All of this was done in the presence of the child. When the boat was returned, the paternal grandmother returned the sippy cup to the mother around 8:30 p.m. The record indicates that the paternal grandmother wanted to make a record of the fact that she had returned the sippy cup to the mother so she went inside the police department and filed a “report.”
In December 2010, the paternal grandmother picked up the child for visitation and her vehicle was packed so that the father could take the child on a trip to Tennessee to see his family. The mother stated that the child could not go because she did not know about the trip and she was upset because the child’s child-re *425 straint seat was not in the center of the back seat of the vehicle. The paternal grandmother testified that she and the father had tried to contact the mother about the trip but that the mother had refused to communicate with them. The mother began to put the child back in her vehicle, and the child began crying and trying to tell the mother that the paternal grandmother would move the child-restraint seat. The paternal grandmother stated that, at that time, the mother had allowed the child to ride in a “booster” seat on one side of the back seat of her vehicle but she would not allow the child to ride in a regular child-restraint seat on one side of the back seat of the paternal grandmother’s vehicle. Also in December 2010, the maternal grandmother threatened to not allow the child to visit the father because the paternal grandmother had the child’s half brother, who was seven months old at the time, in the vehicle with her.
The paternal grandmother stated that the mother had stopped speaking to her at visitation exchanges after court dates were set on the parties’ pending petitions. The paternal grandmother testified that, when she asks the mother a question, the mother ignores her, but the child will tell the mother to respond or the child will prompt the mother to respond. The paternal grandmother stated that the child had told her that the mother had told her that she did not have to obey the paternal grandmother.
The mother admitted that she had overreacted about the missing sippy cup and the position of the child’s child-restraint seat, but she stated that she had been thinking only of the child’s best interests. She also admitted that she allowed the child to call her current husband “daddy.” The mother testified that she did not mind if the child called the father’s current wife “mommy.” She admitted that she had continued to use her maiden name for the child’s surname even after the child’s birth certificate had been changed.
During the first day of the ore tenus hearing, the mother withdrew her request to decrease the father’s visitation with the child. The parties also stipulated that the maternal grandmother and the paternal grandmother would no longer act as intermediaries for the parties, that the father would maintain health-insurance coverage for the child, that each party would have the “right of first refusal” to care for the child during the other parties’ custodial periods, that each party would have reasonable telephone visitation with the child, and that each party would notify the other of the child’s medical issues.
The father admitted that the child was happy and healthy, that she appeared well cared for, and that the child probably considered the mother’s house to be her “home.” He accepted responsibility for some of the communication problems between himself and the mother, and he testified that the communication problems might be resolved by some of the joint stipulations that had been made by the parties.
Although she testified that she was willing to make some changes in order to communicate better with the father, the mother admitted that she had discussed the possibility of limiting the father’s visitation time with the child on the last day of the ore tenus hearing. She testified that she did not think that the father should get additional time with the child but that, if the father was awarded custody, she should get more time with the child then what the father had. She stated that she had encouraged the child’s relationship with the father by not talking negatively about the father, but she admitted that she did not talk about the father at all in front on the child. During her testimony, the *426 mother could not think of another way to encourage the child’s relationship with the father. The mother stated that all the hostility and the problems she had with the father and his family were not having a very good affect on the child.
The record indicated that the child had been on Medicaid until approximately May 2010 when the father added the child to his family health-insurance coverage through the father’s wife’s employer. The father testified that he had obtained health insurance for the child when he began exercising longer periods of custody with the child in case something happened to the child while she was visiting him and that he did not know that his actions would operate to make the child ineligible for Medicaid. As noted above, the parties stipulated that the father would maintain health insurance for the child. The father’s cost of medical and dental insurance for the child was $465.26 per month, and the father testified that that amount was taken out of his wife’s paycheck every month.

Standard, of Review

“When evidence in a child custody case has been presented ore tenus to the trial court, that court’s findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing. See Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), wherein this Court, quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993), set out the well-established rule:
“ ‘ “Our standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, Payne v. Payne, 550 So.2d 440 (Ala.Civ.App.1989), and Vail v. Vail, 532 So.2d 639 (Ala.Civ.App.1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court’s discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. Gamble v. Gamble, 562 So.2d 1343 (Ala.Civ.App.1990); Flowers v. Flowers, 479 So.2d 1257 (Ala.Civ.App.1985).” ’ ”
Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).

Discussion

I. The Mother’s Appeal
In support of its judgment modifying custody of the child, the trial court specifically found (1) that the parties were unable to communicate, (2) that the mother had used poor judgment in her behavior toward the father and his family, (3) that the mother’s behavior had been detrimental to the child, and (4) that the mother had attempted to interfere with the relationship between the child and the father. On appeal, the mother contends that those findings are not supported by the evidence and that, even if they are, they are insufficient to support a finding of a material change in circumstances sufficient to meet the burden set forth in Ex parte McLendon, supra.
Regarding the McLendon burden, this court has held:
“The burden set out in McLendon requires the parent seeking a custody change to demonstrate [ (1) ] that a ma *427 terial change in circumstances has occurred since the previous judgment, [ (2) ] that the child’s best interests will be materially promoted by a change of custody, and [ (3) ] that the benefits of the change will more than offset the inherently disruptive effect resulting from the change in custody. Ex parte McLendon, 455 So.2d at 866.”
Dean v. Dean, 998 So.2d 1060, 1065 (Ala.Civ.App.2008). Regarding the first prong of the McLendon burden set forth above, the “material change” must be one “ ‘affecting the child’s welfare since the most recent decree ....’” McLendon, 455 So.2d at 865 (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976)). Our supreme court has rejected the notion that a party seeking to modify a prior custody judgment must prove that there is an “overwhelming necessity” for the change in custody. See Ex parte Cleghorn, 993 So.2d 462, 468-69 (Ala.2008).
We find sufficient evidence in the record to support the trial court’s conclusion that the parties were unable to communicate, that the mother exercised poor judgment in her behavior toward the father and his family, that the mother’s behavior had a detrimental impact on the child, and that the mother had attempted to interfere with the child’s relationship with the father. The record indicates that the mother behaved in an immature and unreasonable manner in various interactions with the father and the paternal grandmother, who was designated as the sole individual from the father’s side of the family who could communicate with the mother about the child. The record demonstrates that the four-year-old child had attempted to reason with the mother during her displays of unreasonable behavior and that most of the mother’s displays of unreasonable behavior, or her attempts to keep the child from spending time with the father, occurred in front of the child. The mother admitted that the hostility between herself and the father and his family was not having a good affect on the child and that the only thing that she had done to foster a relationship between the father and the child was to not say anything about the father at all. We cannot conclude that the trial court was plainly or palpably wrong by concluding that the mother’s behavior had had a detrimental impact on the child.
Finding evidence to support the trial court’s factual determinations, we must consider whether those findings were sufficient to support the trial court’s conclusion that there had been a material change in circumstances affecting the child’s welfare since the entry of the December 2007 judgment. We conclude that there was sufficient evidence to support such a conclusion. Although we do not believe that the evidence presented rises to a level of supporting a finding of parental alienation, see, e.g., C.J.L. v. M.W.B., 879 So.2d 1169 (Ala.Civ.App.2003) (affirming a judgment modifying custody of the children in favor of the father after the trial court concluded that the mother had, among other things, withheld visitation from the father in an attempt to completely alienate the children from the father), this court has recognized that a custodial parent’s attempts to interfere with a noncustodial parent’s relationship with the child should be considered in determining whether custody of the child should be modified. See, e.g., Sankey v. Sankey, 961 So.2d 896 (Ala.Civ.App.2007) (affirming a judgment modifying custody from the father to the mother when the evidence indicated that the father had a close relationship with the children, the father had encouraged and supported the mother’s relationship with the children, the mother had consistently attempted to harm the father’s relationship with the *428 children, and the quantity and quality of the children’s contact with both parents would be better served by awarding custody of the children to the father); and Adams v. Adams, 21 So.3d 1247, 1254 (Ala.Civ.App.2009) (affirming a judgment modifying custody of the child from the mother to the father when the evidence indicated that the mother had exposed the children to foul language and inappropriate conduct and “had involved the children in her efforts to fight with or to punish the father”).
The mother contends that she did not interfere with the child’s relationship with the father because she did not withhold court-ordered visitation from the father and because the father testified that he had a good relationship with the child. We agree with the mother’s contention that custody should not be modified because she withheld supplemental visitation from the father, see Cochran v. Cochran, 5 So.3d 1220, 1228 (Ala.2008), and that visi tation disputes alone will not support a judgment modifying custody, see id. (citing Foster v. Carden, 515 So.2d 1258, 1260 (Ala.Civ.App.1987)). However, the facts of this case present a more serious problem than a visitation dispute. The trial court could have concluded that the mother had engaged in behavior designed to frustrate and thwart the father’s relationship with the child. The trial court was presented with evidence indicating that even after she had made certain stipulations that the father thought might improve circumstances between himself and the mother, the mother had still inquired of her attorney on the last day of the ore tenus hearing about the possibility of limiting the father’s time with the child. The mother’s testimony clearly indicated that she believed that she did not have to co-parent the child with the father because she had sole custody, and, despite the joint stipulations made, there is no indication that the mother had swayed from her position that the father is simply a visitor of the child with no additional rights. Certainly, the mother’s status as the child’s sole legal and physical custodian gave her superior custodial rights to the child, see Ala.Code 1975, § 30-3-151(4) and (5) (defining “sole legal custody” and “sole physical custody”), but the mother’s status as the child’s sole custodian did not give her the ability to use those rights to the detriment of the child.
Accordingly, we cannot conclude that the trial court erred by concluding that there had been a material change in circumstances that affected the welfare of the child since the entry of the December 2007 judgment.[2] Although the mother has cited caselaw in her brief on appeal that generally sets forth the burden the father was required to meet pursuant to McLen-don, the mother does not argue on appeal that there was insufficient evidence to support the trial court’s conclusion that the change in custody would materially promote the child’s best interests or that there was insufficient evidence to support the trial court’s conclusion that the benefits of the change would more than offset the inherently disruptive effects caused by the change in custody. See McLendon, supra. Therefore, the mother has waived those arguments on appeal. See Gary v. *429 Crouch, 923 So.2d 1130, 1136 (Ala.Civ.App.2005) (citing Boshell v. Keith, 418 So.2d 89, 92-93 (Ala.1982)) (“[T]his court is confined in its review to addressing the arguments raised by the parties in their briefs on appeal; arguments not raised by the parties are waived.”). Accordingly, we affirm the trial court’s judgment modifying custody of the child.
II. The Father’s Cross-Appeal
On appeal, the father contends that the trial court erred by failing to modify his child-support obligation. He argues that the trial court should have (1) deviated from the child-support guidelines in light of its custody-modification judgment, which awarded him joint physical custody of the child, and (2) that the trial court should have recalculated his child-support obligation to include the cost of the child’s health insurance.
Initially, we note that Rule 32, Ala. R. Jud. Admin., provides that an award of “[sjhared physical custody or visitation rights providing for periods of physical custody or care of children by the obligor parent substantially in excess of those customarily approved or ordered by the court” may be a reason for deviating from application of the child-support guidelines. Rule 32(A)(1)(a), Ala. R. Jud. Admin. However, considering the absence of authority cited by the father in his brief on appeal in support of this argument, we will not address it further. See Rule 28(a)(10), Ala. R.App. P. (requiring an appellant to cite authority to support arguments presented on appeal); and State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 822 (Ala.2005) (citing Ex parte Showers, 812 So.2d 277, 281 (Ala.2001)) (“[I]t is well settled that a failure to comply with Rule 28(a)(10) requiring citation of authority in support of the arguments presented provides [an appellate cjourt with a basis for disregarding those arguments.”).
Regarding his second argument, that the trial court erred by failing to include the actual cost of the child’s health-insurance coverage in determining his child-support obligation, the father argues that the trial court erred by denying this request for relief in his postjudgment motion without first conducting a hearing. The record indicates that the father requested a hearing on his postjudgment motion, and there is no indication in the record that the trial court conducted a hearing before it denied the father’s requests for an amended judgment modifying his child-support obligation.
“ ‘Rule 59(g), Ala. R. Civ. P., provides that post-judgment motions “shall not be ruled upon until the parties have had an opportunity to be heard thereon.” We have said that if a hearing is requested, it must be granted. Staarup v. Staarup, 537 So.2d 56 (Ala.Civ.App.1988). On appeal, however, if an appellate court determines that there is no probable merit to the motion, it may affirm based on the harmless error rule. Walls v. Bank of Prattville, 554 So.2d 381 (Ala.1989).’ ”
Carleton v. Carleton, 84 So.3d 84, 86 (Ala.Civ.App.2011) (quoting Hill v. Hill, 681 So.2d 617, 619 (Ala.Civ.App.1996)). Accordingly, we must consider whether there was probable merit to the arguments presented in the father’s postjudgment motion, which were: (1) that the trial court should have ordered him to maintain health insurance for the benefit of the child and (2) that the trial court should have recalculated his child-support obligation to give him credit for paying the cost of the child’s health-insurance coverage.
Rule 32(B)(7)(a), Ala. R. Jud. Admin., provides, in part:
*430 “Medical support in the form of health-insurance coverage and/or cash medical support shall be ordered provided that health-insurance coverage is available to either parent at a reasonable cost and/or cash medical support is considered reasonable in cost.”
(Emphasis added.)
The determination whether, given the parties’ incomes and the support to be paid to the child, health-insurance coverage is available at a reasonable cost is a factual determination to be made by the trial court; such a determination is within the trial court’s discretion and will not be reversed absent an abuse of discretion. Jones v. Jones, 101 So.3d 798, 800 (Ala.Civ.App.2012); Egres v. Egres, 85 So.3d 1026, 1030 (Ala.Civ.App.2011). Although neither party contended below that the cost of the health insurance obtained by the father was not reasonable and although there is no indication in the record that the trial court concluded that the cost of the health insurance provided by the father was not reasonable, a judgment that is correct for any reason may be affirmed on appeal, even if the trial court does not expressly rely on that reason in reaching its judgment or if it cites an incorrect reason. Boykin v. Magnolia Bay, Inc., 570 So.2d 639, 642 (Ala.1990).
The child-support guidelines define “reasonable cost” for health insurance in the calculation of child support to include:
“[T]he cost of private health insurance is considered reasonable in cost if the cost to the parent responsible for providing medical support does not exceed 10% of his of her gross income. For purposes of applying the 10% standard, the cost is the cost of adding the child or children to existing coverage or the difference between self-only and family coverage, whichever is greater.”
Rule 32(B)(7)(c)(3), Ala. R. Jud. Admin.
In this case, the father, who had the burden of proving that his child-support obligation was due to be modified, see Parker v. Parker, 87 So.3d 581, 583 (Ala.Civ.App.2012), failed to present any evi dence regarding the difference in cost of “adding the child or children to existing coverage or the difference between self-only and family coverage.” The record indicates that the father sought to reduce his $548 monthly child-support obligation by a proportionate share of health-insurance premiums that cost his wife $465.86 per month. The evidence demonstrates that the father’s wife’s payment for health-insurance coverage is equivalent to 17% of the father’s gross income. Accordingly, we conclude that the trial court could have determined that, given the parties’ incomes and the level of support for the child, the cost of providing private health insurance in this case was not reasonable under the Rule 32 child-support guidelines. The cost of providing that insurance would exceed the presumed “reasonable cost” to warrant inclusion in the calculation of child support. Further, the modification the father proposed would reduce the father’s child support by $316, more than half the amount he was ordered to pay in the original child-support judgment.[3] Given those facts, we conclude that the evidence supports the trial court’s denial of the father’s claim seeking to modify child support, and, therefore, we cannot conclude that there was probable merit to the father’s post-judgment motion on that issue. Accordingly, the trial court’s failure to conduct a *431 hearing on the father’s postjudgment motion was harmless error.

Conclusion

The mother’s appeal from the trial court’s judgment modifying custody of the child is affirmed. The father’s cross-appeal of the trial court’s judgment is also affirmed.
APPEAL — AFFIRMED.
CROSS-APPEAL — AFFIRMED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.
THOMPSON, P.J., concurs in the result as to the cross-appeal and dissents as to the appeal, with writing.

. The trial court specifically stated in its judgment that "the [father] used very poor judgment in pulling a firearm on another driver while driving down the road.”

. The mother contends, for the first time on appeal, that the modification of custody was erroneous because there was not a compelling reason to separate the child from her half sister, i.e., the mother’s child with her current husband. There is no indication in the record on appeal that the mother presented this argument to the trial court. Accordingly, we will not consider it on appeal. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (an appellate court cannot consider argument that was not first presented to the trial court for its consideration).

. In his CS-42 child-support form, the father calculated his proposed child-support obligation, including the offset for the full amount of the health-insurance premium paid by his wife, to be $232.57 per month.