Rel: April 10, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

_____

### CL-2025-0654

_____

### D.S. and B.S.

### v.

### R.S. and Br.S.

_____

### CL-2025-0659

_____

### R.S. and Br.S.

### v.

### D.S. and B.S.

### Appeals from Blount Circuit Court
### (JU-22-276.03)

CL-2025-0654 and CL-2025-0659

EDWARDS, Judge.

In appeal number CL-2025-0654, D.S. and B.S. ("the paternal grandparents") appeal from a judgment entered by the Blount Circuit Court insofar as that judgment ordered R.S. ("the father") and Br.S. ("the mother"), the parents of K.S. ("the child"), to pay to the paternal grandparents child support in the amount of $300 per month. In appeal number CL-2025-0659, the parents cross-appeal from that same judgment insofar as it denied their petition to modify the custody of the child.

The record indicates that the parties originally were neighbors and that the child regularly visited the paternal grandparents. Sometime before May 2023, the Blount County Department of Human Resources ("DHR") initiated in the Blount Juvenile Court a dependency action against the mother and the father. In May 2023, the juvenile court entered a judgment finding the child dependent,[1] awarding custody of the child to the paternal grandparents, and permitting the paternal

---

[1]It is not clear from the record what circumstances caused the child's dependency.

grandparents to relocate with the child to Conway, South Carolina.[2]  The

May 2023 dependency judgment also directed that the parents would

have

> "four hours of supervised visitation every other weekend in Conyers, GA[,] at the Chuck E. Cheese unless agreed upon otherwise by the parties.  The parents shall provide at least 24-hours notice to the custodians of their intention to visit. Further the parents shall have reasonable phone and facetime visitation with the child at least three times per week on Monday, Wednesday[,] and Friday between 4:00 p.m. and 7:00 p.m. The parties may set up an[y] other visitation that they so choose as long as it remains supervised at this time."

The parents were also required to comply with DHR's reunification plan.[3]

The record indicates that, in July 2023, the parents filed a petition

in the juvenile court requesting that the child be returned to their custody

and that the paternal grandparents be held in contempt for failing to

abide by the visitation provisions in the May 2023 dependency judgment.

The paternal grandparents filed an answer and a counterclaim for child

support.  Following a trial, the juvenile court entered a judgment on

---

[2]It appears that the paternal grandparents were not parties to the dependency action.

[3]The May 2023 dependency judgment also provided that DHR was permitted to "close [its] case" regarding the parents and the child.

3

December 31, 2024, returning to the child to the parents' custody and denying all other relief. The child subsequently returned to the parents' residence in Alabama. The paternal grandparents appealed the juvenile court's December 2024 modification judgment to this court. The juvenile court subsequently entered an order determining that the record was not adequate for purposes of appeal, and this court, in compliance with Rule 28(B) and (E), Ala. R. Juv. P., transferred the appeal to the Blount Circuit Court for a trial de novo. See D.S. v. R.S. (No. CL-2025-0066, Feb. 20, 2025).

Before the trial de novo was conducted by the circuit court, the paternal grandparents filed a motion requesting that the child be returned to their custody pendente lite. The circuit court granted that motion.

The circuit court held a trial on June 27, 2025, at which it received ore tenus evidence. The parents asserted in their testimony that the paternal grandparents had not permitted the parents to exercise their court-ordered visitation with the child between May 2023 and the child's return to their custody on December 31, 2024. According to the mother, the paternal grandmother had consistently attempted to dictate

4

visitation terms that differed from those contained in the juvenile court's May 2023 dependency judgment. The mother also testified that she had attempted to contact the paternal grandmother on numerous occasions to confirm the parents' visitation with the child as required by the May 2023 dependency judgment and that the paternal grandmother had not answered her telephone and had not returned the mother's calls.

The paternal grandmother conceded that the required visitations had not occurred and stated that she had not believed that the paternal grandparents were bound by the May 2023 dependency judgment because, she said, they had not been parties to the dependency action. She asserted that the parents had generally failed to give the paternal grandparents sufficient notice or, at times, any notice that they wanted to exercise their visitation with the child, and she disputed the mother's testimony indicating that the mother had made numerous attempts to contact the paternal grandmother regarding visitation with the child. She also testified that she had not cooperated with the parents, in part, because the mother would yell at her during telephone calls. The paternal grandmother further testified that she had attempted to suggest different days for the parents to visit the child but that the parents had

sought to adhere strictly to the terms of the May 2023 dependency judgment.[4] The paternal grandmother testified that the paternal grandparents would abide by whatever visitation terms the circuit court determined were appropriate if they retained custody of the child.

The mother also testified that the paternal grandmother had required the parents' telephone calls with the child to be conducted at 4:00 p.m. and that, as a result, the father had largely been unable to speak to the child because he was at work. The parents indicated that the paternal grandmother would not permit the parents to call later than 4:00 p.m. to accommodate the father's work schedule. The mother testified that she believed that the paternal grandmother had permitted her to speak with the child during her initial telephone calls 80% of the time. The paternal grandmother generally denied requiring the parents' telephone calls to occur exactly at 4:00 p.m. and explained that she had refused several of the mother's telephone calls because the child had been engaged in another activity or eating dinner when the mother had called. The paternal grandmother also testified that she had not received any

_____

[4]The paternal grandmother explained that the paternal grandparents had not been consulted regarding the visitation schedule during the dependency action.

telephone calls from the father asking to speak to the child.[5]  The mother conceded that the paternal grandmother and the child would usually return her call at a later time if her initial call was not answered.  The mother also testified that the paternal grandmother had frequently answered on the child's behalf during the telephone calls or would end the telephone call after approximately two minutes.  The paternal grandmother testified that she would remind the child of things to talk about or would offer discussion points if the child did not offer conversation during the telephone calls.  The paternal grandmother testified that she had made two attempts to speak to the child during the four months that he had resided with the parents after the entry of the December 2024 modification judgment and that she had been denied both times.

The mother expressed her concern that the paternal grandparents had not properly cared for the child's medical needs when he was in their custody.  The mother explained that the child has an aortic-valve birth

---

[5]The record indicates that the majority of the communications between the parties concerning the child were between the mother and the paternal grandmother.  The record reflects that the father and the paternal grandparents do not have a harmonious relationship.

7

defect that requires yearly examination by a cardiologist. The parents also stated that the child had returned from the paternal grandparents' custody weighing approximately 30 pounds more than when he had left the parents' custody and that he had become lethargic. The paternal grandmother testified that she had regularly taken the child to the doctor and the dentist and that the child had visited a cardiologist in South Carolina. She explained that the child had been "very, very hyper" when he had entered the paternal grandparents' custody and that, as a result, the child had been prescribed Guanfacine, which appears to be a medication prescribed to treat attention-deficit/hyperactivity disorder.

Kaylie Wingo, a DHR social worker and investigator, testified that she became involved with the parents and the child in January 2025 after DHR received a report that an individual was concerned with the suddenness of the child's reunification with the parents. Wingo testified that she had visited the parents' residence within five days of the report and noted that the residence had been "a little cluttered" but that she had not had any concerns regarding the child's safety and well-being. She stated that she did not have any concerns after conversations with the parents or the child and that she had not developed any concerns

after she had observed R.S., Jr., the parents' two-year-old son, in the residence. Wingo also testified that the child's school had contacted DHR about the child's sleeping in the classroom. Wingo stated that she had contacted the parents and had requested that they take the child to a doctor. Wingo reported that insomnia was a side-effect of the child's medication and that the parents had, after consulting with a doctor, provided the child with melatonin. According to Wingo, the school again contacted DHR several months later with concerns that the child had started sleeping in class again. Wingo again requested that the parents consult a doctor, and it was determined that the child's dosage of melatonin was too strong. Wingo explained that, after the melatonin dosage was corrected, the child had not had any problems and that DHR had closed its case. Wingo testified that she did not have a preference regarding the award of the custody of the child and that she did not have any concerns regarding the possibility that the child would be returned to the parents' custody. The child's guardian ad litem offered a similar opinion.

The record does not contain any documentary evidence or testimony regarding the incomes of the parties. The mother testified that she was

9

employed; her testimony does not indicate where she was employed, what position she held, or how much income she earned. The father testified that he was an assistant branch manager at an electrical-supply distributor; his testimony also does not reveal his income. The parents testified, however, that they would be able to financially support the child. There is no testimony regarding the income of the paternal grandparents.

The mother testified that, although the parents had not been required to make child-support payments under the May 2023 dependency judgment, they had purchased items for the child before the paternal grandparents relocated to South Carolina. The mother testified that, after the child had relocated to South Carolina, the parents had sent the child only a birthday gift and had sent the paternal grandparents only one gift card for the paternal grandparents to use for the child's expenses.[6] The mother also testified that she had sent the child a pair of shoes and some items of clothing; the paternal grandmother denied receiving any shoes or clothing.

---

[6]Neither the amount of the gift card nor the store at which it could be redeemed is contained in the record.

10

Although it is not clear from the record, it appears that the mother's brother ("the maternal uncle") had resided with the parents before the entry of the May 2023 dependency judgment and that he had resided in the child's bedroom. The mother explained that the maternal uncle had left the residence and that the child would have his own room. The parents also explained that they had made an effort to spend more time with the child when he had been temporarily returned to their custody. They testified that they would have sufficient time to adequately rear him and that their residence was no longer "as clutter[ed]" as it had been during the dependency proceedings. They also testified that they had complied with DHR's requirements from the dependency action by completing parenting classes and domestic-violence classes.[7]

On July 22, 2025, the circuit court entered a factually detailed judgment holding the paternal grandparents in contempt but finding that the parents had failed to demonstrate that a material change in circumstances had occurred warranting a modification of the child's

_____

[7]It appears that the parents had been required to complete those classes by May 1, 2023. The parents acknowledged that they did not complete the classes by that deadline but testified that those classes had been completed at the time of the June 2025 trial.

11

custody. See Ex parte McLendon, 455 So. 2d 863, 865 (Ala. 1984). The circuit court's judgment also modified the parents' visitation with the child by providing the parents expanded, unsupervised visitation with the child at their residence; it also ordered the parents to pay the paternal grandparents $300 each month in child support and noted, without further explanation, that that amount was not calculated pursuant to the guidelines found in Rule 32, Ala. R. Jud. Admin. As a sanction for the paternal grandparents' contempt, the circuit court ordered that the paternal grandparents would be responsible for transporting the child to all required visitations, which were to occur at the parents' Blount County residence. On July 31, 2025, the parents filed a postjudgment motion contesting the circuit court's determination that they had not satisfied their burden under Ex parte McLendon. That motion was denied by operation of law on August 14, 2025. See Rule 1(B), Ala. R. Juv. P., and Rule 59.1, Ala. R. Civ. P. See also W.C.R. v. D.A.L., 18 So. 3d 420, 422 (Ala. Civ. App. 2009) ("The Rules of Juvenile Procedure apply in an appeal to the circuit court of a juvenile court's judgment. Rule 1(B), Ala. R. Juv. P., specifies that the '[p]rocedure shall be uniform in all juvenile courts, whether at the circuit or district court level or in the

12

circuit court by trial de novo.' (Emphasis added)."). The paternal

grandparents filed their notice of appeal to this court on August 13, 2025.

The parents filed a cross-appeal on August 14, 2025. On August 19, 2025,

we consolidated the appeal and the cross-appeal, ex mero motu.

On appeal, the paternal grandparents argue that the circuit court's

judgment is erroneous insofar as it awarded the paternal grandparents

$300 each month in child support because, they contend, the circuit court

failed to apply Rule 32 and because the record does not contain a Form

CS-41 Child-Support-Obligation Income Statement/Affidavit for any of

the parties or a Form CS-42 Child-Support Guidelines form. In their

cross-appeal, the parents assert that the circuit court's judgment is not

supported by the evidence and that they met their burden to modify the

child's custody under the custody-modification standard set out in Ex

parte McLendon.

> "'When evidence in a child custody case has been presented
> ore tenus to the [juvenile] court, that court's findings of fact
> based on that evidence are presumed to be correct.' Ex parte
> Bryowsky, 676 So. 2d 1322, 1324 (Ala. 1996). As our supreme
> court explained in Bryowsky, '[t]he trial court is in the best
> position to make a custody determination -- it hears the
> evidence and observes the witnesses.' Id. An appellate court
> is not permitted to reweigh the evidence or to substitute its
> judgment for that of the trial court. See Phillips v. Phillips,
> 622 So. 2d 410, 412 (Ala. Civ. App. 1993). On the other hand,

13

the ore tenus presumption of correctness does not apply to a juvenile court's conclusions regarding questions of law, and an appellate court reviews those conclusions de novo. See R.K. v. R.J., 843 So. 2d 774, 776 (Ala. Civ. App. 2002)."

B.F. v. C.D., [Ms. CL-2025-0032, Aug. 22, 2025] ___ So. 3d ___, ___ (Ala. Civ. App. 2025), rev'd on other grounds, Ex parte C.D., Ms. SC-2025-0655, Mar. 27, 2026] ___ So. 3d ___, ___ (Ala. 2026).

We first address the parents' cross-appeal concerning the circuit court's denial of their petition to modify the child's custody. "'When a juvenile court has entered a judgment awarding custody of a dependent child to a relative, a parent seeking to modify that custody judgment must meet the Ex parte McLendon[, 455 So. 2d 863 (Ala. 1984)], standard in order to regain custody of the child.'" K.Y. v. J.S., 393 So. 3d 540, 541 (Ala. Civ. App. 2023) (quoting P.A. v. L.S., 78 So. 3d 979, 981 (Ala. Civ. App. 2011)). The McLendon standard requires

"the parent seeking a custody change to demonstrate that a material change in circumstances has occurred since the previous judgment, that the child's best interests will be materially promoted by a change of custody, and that the benefits of the change will more than offset the inherently disruptive effect resulting from the change in custody. Ex parte McLendon, 455 So. 2d at 866."

Dean v. Dean, 998 So. 2d 1060, 1065 (Ala. Civ. App. 2008).

14

The parents' argument rests solely on their assertion that the paternal grandparents deliberately denied the parents visitation with the child for nearly two years and prevented the child from speaking to the parents on the telephone for longer than two minutes outside the presence of the paternal grandmother. Generally, visitation issues are not a material change in circumstances that warrant a modification of a child's custody. Cochran v. Cochran, 5 So. 3d 1220, 1229 (Ala. 2008). However, this court has recognized that a visitation issue can rise to the level of parental alienation, which would be a potential material change in circumstances warranting modification of a child's custody. See C.J.L. v. M.W.B., 879 So. 2d 1169 (Ala. Civ. App. 2003).

In support of their argument, the parents rely on our decisions in C.J.L. and in K.T.D. v. K.W.P., 119 So. 3d 418 (Ala. Civ. App. 2012). In both C.J.L. and K.T.D., this court affirmed the modification a child-custody judgment based on evidence indicating that the party appealing the child-custody-modification judgment had withheld visitation from the other party as part of a "campaign to undermine the [opposing party's parental] role," C.J.L., 879 So. 2d at 1180, or had "engaged in behavior designed to frustrate and thwart the [opposing party's] relationship with

15

the child," <u>K.T.D.</u>, 119 So. 3d at 428. Notably, in both of those cases the fact that a party had prevented the opposing party from exercising his or her visitation with the children at issue was the product of a larger effort to deliberately alienate the children from the opposing party.

In this case, the circuit court determined that the paternal grandparents had had "no intention" of following the visitation schedule set forth in the May 2023 dependency judgment and that the paternal grandparents "held an unfounded belief that the [May 2023 dependency judgment] did not apply to them." The record supports that finding. However, in denying the parents' child-custody-modification petition, the circuit court implicitly found that the paternal grandparents had not intended to entirely withhold the child from the parents and were not engaged in a campaign aimed at alienating the child from the parents. The record also supports that finding. The paternal grandmother testified that she had permitted the child to speak to the mother on the telephone and had allowed the child to call the parents if the child was initially unavailable. She further testified that, although she had not complied with the visitation provisions in the May 2023 dependency judgment, she had communicated with the mother about alternative

16

visitation venues and dates. The circuit court could have determined from that testimony that the paternal grandparents, although not compliant with the May 2023 dependency judgment, had not intended to alienate the child from the parents. Thus, we affirm the circuit court's judgment insofar as it denied the parents' petition to modify the child's custody.

In the paternal grandparents' appeal, they argue that the circuit court erred in its determination of child support because, they say, the circuit court failed to apply Rule 32 and because the record does not contain a Form CS-41 Child-Support-Obligation Income Statement/Affidavit for any of the parties or a Form CS-42 Child-Support Guidelines form. We agree.

As this court has held:

> "'A noncustodial parent's child-support obligation is governed by the mandatory application of Rule 32, Ala. R. Jud. Admin. <u>Smith v. Smith</u>, 587 So. 2d 1217 (Ala. Civ. App. 1991). Rule 32(E), Ala. R. Jud. Admin., states that "[a] standardized Child Support Guidelines form and a Child Support Obligation Income Statement/Affidavit form <u>shall</u> be filed in each action to establish or modify child support obligations and [that those forms] shall be of record and shall be deemed to be incorporated by reference in the court's child support order."

17

> (Emphasis added.) The filing of the child-support-guidelines forms required under Rule 32(E) is mandatory. <u>Martin v. Martin</u>, 637 So. 2d 901 (Ala. Civ. App. 1994). This court has consistently held that the failure to file the required child-support-guidelines forms in compliance with Rule 32(E) where child support is made an issue on appeal is reversible error. <u>Holley v. Holley</u>, 829 So. 2d 759 (Ala. Civ. App. 2002); <u>Gordon v. Gordon</u>, 804 So. 2d 241 (Ala. Civ. App. 2001); and <u>Martin v. Martin</u>, supra.'
>
> "<u>Wilkerson v. Waldrop</u>, 895 So. 2d 347, 348-49 (Ala. Civ. App. 2004). See also <u>Batain v. Batain</u>, 912 So. 2d 283, 285 (Ala. Civ. App. 2005)(reversing child-support judgment because this court could not 'discern the basis for the trial court's child-support judgment')."

<u>Morrow v. Dillard</u>, 257 So. 3d 316, 325-26 (Ala. Civ. App. 2017).

The circuit court stated in its judgment that its award of child support "[was] not calculated pursuant to ... Rule 32." Moreover, the record contains neither the requisite child-support forms nor evidence of the incomes of the parties. But see <u>R.D.F. v. R.J.F.</u>, 271 So. 3d 831, 839 (Ala. Civ. App. 2018) (noting that this court need not reverse a child-support award when the required forms are missing if it is clear from the record that the child-support award comports with the evidence of the parties' incomes). We further note that the parents concede that the circuit court failed to apply Rule 32 in determining child support.

18

Accordingly, we reverse the judgment of the circuit court insofar as it ordered the parents to pay child support to the paternal grandparents in the amount of $300 per month. We remand the case with instructions for the circuit court (1) to order the parties to submit the forms required by Rule 32(E), Ala. R. Jud. Admin., (2) to conduct an evidentiary hearing regarding the incomes of the parties, and (3) based on the forms and evidence presented, to enter a child-support judgment in compliance with Rule 32.

CL-2025-0654 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

CL-2025-0659 -- AFFIRMED.

Moore, P.J., and Hanson, Fridy, and Bowden, JJ., concur.